IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FMS INVESTMENT CORP., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Nos. 18-862C, 18-872C, 18-873C, |
| v. | ) | 18-889C, 18-894C, 18-895C, |
| | ) | 18-901C (consolidated) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | Judge Thomas C. Wheeler |
| | ) | |
| and | ) | |
| | ) | |
| ALLTRAN EDUCATION, INC. | ) | |
| | ) | |
| Intervenor-Defendant. | ) | |

## INDEX TO THE ADMINISTRATIVE RECORD

| Tab | Document Name/Description | Page |
|---|---|---|
| 1 | Student Loan Pilot Report  (July 2016) | 1 |
| 2 | PCA Transfers - October 22, 2014 thru March 2017 | 12 |
| 3 | Email Transmittal - Default Management Approach (May 3, 2018) | 13 |
| | a.  FSA Strategy Document | 14 |
| | b.  DMCS Inventory Report PCA Workgroups (April 2018) | 18 |
| | c.  DMCS Inventory Report All Workgroups (April 2018) | 19 |
| | d.  All Performance Tracking Summary (March 2018) | 23 |
| | e.  Allocations (March 2018) | 25 |
| | f.  Account Capacity (As of  March 2018) | 26 |
| 4 | Memorandum to File - Cancellation Decision - Solicitation No. ED-FSA-16-R-0009 (May 3, 2018) | 27 |

**Report on Initial Observations from the Fiscal-Federal Student Aid Pilot for Servicing Defaulted Student Loan Debt**

In February 2015, the Bureau of the Fiscal Service (Fiscal) at the U.S. Department of the Treasury (Treasury) and the Office of Federal Student Aid (FSA) at the U.S. Department of Education (Education) launched a two-year pilot program (pilot) focused on the servicing of defaulted student loans.  The pilot has provided Fiscal, and the federal government more broadly, with first-hand exposure to the experience of student loan borrowers in default and the effort to assist them.  The pilot is ongoing and while early results are preliminary, this report provides initial findings from the first year; notes the challenges in the servicing of defaulted student loans; and explores what could be potential improvements in the collections process.

## I.    BACKGROUND

Pursuant to the Debt Collection Improvement Act of 1996 (DCIA), Fiscal collects and resolves delinquent, federal non-tax debts on behalf of most federal agencies.  These obligations range from collecting and resolving loans such as home mortgages insured by the Department of Housing and Urban Development and business loans insured by the Small Business Administration to recovering other obligations including fines assessed by enforcement agencies such as the Federal Trade Commission and overpayments by federal agencies.  After approximately 30 days of servicing, Fiscal typically refers the debt to one of four private collection agencies (PCAs) that continue collection activity, unless the debtor has agreed to repay the debt in full or enters into another repayment agreement, or initiates administrative wage garnishment (AWG) proceedings.

While federal agencies are required to refer all delinquent, non-tax debts to Treasury for servicing, the DCIA provides Treasury with the ability to exempt particular categories of debt.  In 2001, Treasury exercised this exemption authority and exempted FSA's student loan debt from the referral requirement.  Accordingly, FSA manages the collection and resolution of delinquent federal student loan debt.

The pilot was designed to give Fiscal first-hand experience in servicing the defaulted federal student loan debt usually collected by FSA through its contracted PCAs or by guaranty agencies that participate in the legacy Federal Family Education Loan program.  To do this, FSA referred a small sample of loans from its outstanding defaulted loan portfolio to Fiscal for collection.[1]  In total, Fiscal received 16,242 defaulted loans representing 5,729 borrowers.  At the time of referral, borrowers have been delinquent on these loans for at least one year.  Fiscal followed the processes and guidelines outlined by FSA as if it were a PCA, and trained its employees participating in the pilot and modified its processes in order to handle these loans.[2]

---

[1] The loans referred in the pilot were at varying stages of default.  A segmented assessment of collections practices of loans in different stages of default would require a more targeted loan pool.

[2] FSA provided borrowers with due process prior to the referral of loans to Fiscal.  Due process provides borrowers the opportunity to repay, dispute, or otherwise resolve their loans before their loans are referred to Fiscal for collections.  Like loans FSA assigns to one of its PCAs, FSA maintains responsibility for reporting to the credit bureaus and referring debts to the Treasury Offset Program and for federal salary offset of debts referred to Fiscal as part of the pilot.

Defaulted student loans, such as those referred in the pilot, differ significantly from other federal debts managed by Fiscal.  Typically, federal agencies refer debts to Fiscal for collections by the time they reach 180 days of delinquency.  In contrast, student loans are at least 420 days delinquent before they are first referred to PCAs by FSA.[3]  Many defaulted student loan loans have been referred to multiple PCAs, and some borrowers may not have ever made a payment on the loan.   The loans referred to Fiscal in the pilot have been in default for, on average, six years, and 57 percent of borrowers had already been referred to one or more PCAs prior to their referral to Fiscal.  Accordingly, this is a category of federal debt that is very difficult to resolve.

**Table A: Pilot Loans by Number of Prior PCA Referrals**

| Number of Prior PCA referrals | Number of Borrowers | Balance of Loans ($mm) | Average Time Since Loan Origination | Average Time in Default |
|---|---|---|---|---|
| All Loans | 5,729 | $80.1 | 10 years | 6 years |
| No prior PCA referrals | 2,486 | $45.3 | 5 years | 1 year |
| 1 prior referral | 524 | $7.5 | 6 years | 2 years |
| 2 prior referrals | 467 | $5.3 | 7 years | 3 years |
| 3-4 prior referrals | 744 | $6.9 | 8 years | 5 years |
| 5 or more prior referrals | 1,508 | $15.1 | 20 years | 17 years |

There also are several unique loan repayment options available for student loans that borrowers may not be aware of or understand.  Most delinquent federal debts are repaid through one of three options: (i) a payment in full of outstanding principal and interest; (ii) a compromise;[4] or (iii) an installment payment agreement for up to 36 months.  Student loan borrowers may have additional options including (i) an installment payment agreement of up to 240 months, (ii) consolidation (if loan(s) have not previously been consolidated) and (iii) a loan rehabilitation (if loan(s) have not previously been rehabilitated).[5]  Borrowers may ultimately be eligible for repayment options that are based on the borrower's income, and these plans have additional elements that require explanation.  These additional options, while of potential value to borrowers, present additional communication challenges.

## II.     PILOT RESULTS THROUGH FEBRUARY 2016

As noted, Fiscal received a total of 16,242 defaulted loans owed by 5,729 borrowers with a balance of approximately $80 million.  The loans were received from FSA in two pools with an initial referral of loans in February 2015 and a second referral at the end of August 2015.  This referral process contrasts with FSA's normal process by which PCAs receive a referral of new

---

[3] The Higher Education Act defines default for federal student loans as loans greater than 270 days delinquent.
[4] Federal agencies generally have authority to enter into compromise agreements with debtors to settle outstanding debt. In a compromise agreement, a debtor agrees to make a lump sum payment for a predetermined dollar amount by a specific date.
[5] Debts also can be resolved via various administrative resolutions.  For example, student loan debts can be resolved if they are deemed uncollectible because of disability, death, or incarceration.

defaulted loans each month.  FSA randomly selected these loans from defaulted loans that it would have otherwise referred to its PCAs.  These loans are generally representative of the composition of the defaulted loan portfolio.  On average, each borrower in the pilot has three defaulted loans with a total outstanding balance of approximately $14,000.  The total per borrower balance ranges from $500 to over $601,500[6] with a median balance of $7,680.

To facilitate a rough comparison, FSA created a comparably sized group of defaulted loans referred to its PCAs to serve as a control group.  Borrowers in this group were selected at random during the same referral periods in which FSA referred loans to Fiscal for the pilot.  Table C provides results on certain metrics for the pilot and the control group, but these results do not capture long-term borrower success or qualitative elements such as customer satisfaction.

**Table B: Loan Characteristics of Pilot vs. Control Group**

|  | *Pilot* | *Control Group* |
|---|---|---|
| Unique Borrowers | 5,729 | 5,729 |
| Individual Loans[7] | 16,242 | 16,916 |
| Total Loan Amount[7] | $80.1M | $82.9M |
| Average Borrower Amount | $13,970 | $14,462 |
| Median Borrower Amount | $7,680 | $7,994 |
| Range of Borrower Amount | $560 - $601,550 | $562 - $631,746 |
| Average Prior PCA Referrals | 4 | 4 |

In the first year of the pilot, Fiscal sent more than 33,000 letters to borrowers and placed more than 21,000 calls in an attempt to initiate a dialogue regarding the borrower's debt.  Borrowers answered Fiscal's calls less than 2 percent of the time.  Fiscal also answered approximately 3,900 calls initiated by borrowers.  By the end of the first year, Fiscal had spoken with approximately 33 percent of the borrowers within Fiscal's defaulted student loan portfolio (i.e., 1,874 unique borrowers).  Fiscal received no complaints, either directly from borrowers or through Education, regarding its collection activities during the first year of the pilot.

During this period, the loans of 237 of the 5,729 borrowers serviced by Fiscal (4.14 percent) were resolved by Fiscal and returned to FSA,[8] compared with 313 of the 5,729 borrowers in the

---

[6] Defaulted debt balances in the upper part of this range are the result of: i) a higher original loan amount, typically resulting from a parent taking out PLUS loans for multiple children or a student pursuing post-graduate higher education in a specialized field (e.g., medicine, law, etc.) and/or ii) the accumulation of accrued interest and fees (i.e., administrative fees, collection costs, etc.) over an extended period of time while a loan was in default.

[7] Includes additional debts referred to Fiscal in order to keep borrowers' defaulted loans with a single servicer.

[8] Debts are resolved and returned to FSA if the outstanding balance is retired, the borrower rehabilitates or consolidates the loans, or an administrative resolution is completed.  Of the loans in the pilot that were returned, 181 borrowers either had their balances fully repaid through the Treasury Offset Program (TOP) collections (108 borrowers) or the borrower consolidated their loans to resolve their default (73 borrowers).  Of the remaining resolutions, 31 borrowers voluntarily paid in full or through compromises, eight completed the loan rehabilitation process, and 17 were returned to FSA after Fiscal provided documentation for administrative resolutions.

control group (5.46 percent).

Table C outlines the collection rate (defined as dollars collected divided by the balance of loans referred) and recovery rate (defined as dollars collected plus the value of loans rehabilitated or consolidated divided by the balance of loans referred) for the pilot group and the control group, thus far.

**Table C: Collections and Recoveries (Dollars in thousands)**[9]

|  | *Pilot* | *Control Group* |
|---|---|---|
| **Collections:** |  |  |
| Rehabilitations (payments received against active rehabilitation agreements and completed agreements) | $18 | $36 |
| Administrative wage garnishment | $3 | $197 |
| Other voluntary payments (e.g., payment in full) | $160 | $340 |
| *Collection rate* | *0.23%* | *0.69%* |
| **Additional Recoveries:** |  |  |
| Completed rehabilitation loan balances (at time loans returned to FSA) | $127 | $2,247 |
| Completed Rehabilitations | 8 borrowers | 126 borrowers |
| *Recovery rate* | *0.38%* | *3.40%* |

Fiscal believes that the differences in collection and recovery rates in the first year of the pilot relative to the control group are driven by several factors including timing of the collections cycle, call frequency and related focus on the borrower experience, and different and additional methods that PCAs may be employing for collections. Fiscal has proceeded relatively slowly through the collections cycle in attempt to optimize borrower engagement and voluntary collection efforts. Fiscal postponed using AWG, which allows garnishment of a borrower's wages without a court order, for a majority of borrowers for the first 11 months of the pilot. The delay not only drove the differential in wage garnishment recoveries detailed in the table above, but likely also contributed to decreased activity generally. Since initiating AWG in January 2016, toward the tail end of the first year of the continuing pilot, there has been an increase in the number of borrowers contacting Fiscal to attempt to resolve their loans and end involuntary collections.

In addition, Fiscal called borrowers in the pilot no more than once per week. This level is likely less frequent than the standard practice of PCAs but permitted Fiscal's call center agents to focus on active borrower interactions and follow-up.

PCAs also utilize tools tailored to support student loan collections that Fiscal has not needed in its cross-servicing program and, given the cost and time required to develop such tools, were not deployed in the pilot. These tools include the use of different systems designed to manage the

---

[9] Data in Table C are based on data from Education's debt collection system.

AR 4

nine-to-twelve month borrower relationship required to complete the rehabilitation program and customized digital capabilities such as self-service portals.

## III.    INITIAL PILOT OBSERVATIONS

During the first year of the pilot, Fiscal has observed a number of variables that impact the collection process for defaulted student loans relative to other federal debts.  These include: (i) how to contact borrowers who have been in default for many years, (ii) how to explain to these borrowers the available repayment options, (iii) how to help borrowers through the rehabilitation process, (iv) how to transition borrowers to a sustainable repayment plan following the completion of rehabilitation, and (v) how to help borrowers avoid involuntary collection processes such as AWG and the Treasury Offset Program (TOP).

### *Contacting Borrowers*

Fiscal's collections work is generally conducted by U.S. mail and through telephone calls and relies on these methods to initiate borrower contact.  In the pilot, student loan borrowers have been difficult to engage using these tools.

In the federal student loan program, borrowers provide their contact information at the time of the loan application and, per the master promissory note and rights and responsibility statement, they are required to update the information throughout the life of their loan.  However, Fiscal observed that contact information may not be updated and, as a result, can be outdated when these loans are referred for collection.

During the first year of the pilot, relatively few borrowers responded to Fiscal's outreach.[10] Fiscal spoke with 33 percent of borrowers by phone, with extremely low response rates to outbound calls.  Borrowers cannot resolve their loans on their own, except through full repayment of outstanding principal and interest.  Therefore, speaking with a call center agent is critical to identifying and enrolling in a repayment option.

Borrowers who spoke with Fiscal were often unaware of, or confused about, their repayment options, which likely contributes to a reluctance to engage with collectors and to the low contact and resolution rates.  Many borrowers have appeared unaware that they could make affordable monthly payments based on their income through loan rehabilitation.  Borrowers in default may be more willing to take action on their defaulted loan if they have clear information about the available options.

In conversations with Fiscal, borrowers have been confused as to why a third party, in this case Fiscal, is contacting them instead of Education regarding their student loans.  Employing consistent Education branding on communications for defaulted borrowers, where possible,[11] could reduce confusion and increase confidence in the legitimacy of the collection activity.

---

[10] Prior to contacting borrowers, Fiscal attempted to update contact information with a commercially available database.  Few borrowers made direct contact with Fiscal.

[11] The Fair Debt Collection Practices Act requires debt collectors identify themselves by corporate affiliation. Therefore, any deviation from this requirement would require an exception before implementation.

AR 5

Currently, opportunities for confusion are elevated because, during the stages of delinquency, several different third-party contractors contact the borrower under their own brand names and borrowers may have previously had contact with different contractors such as loan servicers, FSA's defaulted loan servicer, and other PCAs.

*Complexity of Available Repayment Options*

The number and complexity of repayment options present borrowers with several alternatives from which to determine the optimal approach for their circumstances.  Some repayment options appear similar yet confer different benefits to the borrower.  For example, rehabilitation and consolidation both allow borrowers to return their loans to current status.  Rehabilitation requires at least nine months of on-time payments and requires borrowers to submit paperwork and documentation of income and, in some cases, expenses.[12]  By comparison, borrowers who have not previously consolidated their loans can do so without making any payments if they complete the required paperwork and enroll in an income-driven repayment (IDR) plan.  Borrowers need to understand the subtle differences in these two options in order to assess what is best for them.

Borrowers' options also vary based on whether they have previously rehabilitated or consolidated their loans, requiring call center agents to understand the history of the defaulted loan before discussing repayment options.  As specified in the Higher Education Act, borrowers are only allowed to rehabilitate their loans once, leaving borrowers who re-default with limited options.  Re-defaulted loans can only be satisfied through payment in full, a compromise, installment payments, or a consolidation if the loan(s) had not previously been consolidated.  It is critical, therefore, that borrowers who pursue rehabilitation understand that it can only be successfully completed once and, as such, may not be the most suitable option for borrowers who may not be able to continue to meet their monthly payment obligations once they return to current status.

This complexity of repayment options is reflected in materially longer call handling times relative to Fiscal's other defaulted debts.  In February 2016, the average cross-servicing program call was 5 minutes and 28 seconds whereas the average pilot call was 9 minutes and 4 seconds. In addition, the post-call work time, during which call center agents update the borrower's file and send the borrower any required forms or information, was nearly 4.5 minutes longer for pilot borrowers.

Providing more borrower-centric resources and information may help defaulted borrowers understand and evaluate their options.  FSA maintains a separate website for defaulted student loans, but this site is designed for a number of user types (e.g., schools, guaranty agencies, collection agencies), which may contribute to borrower confusion.  A more borrower-centered experience might ease navigation and provide borrowers with the information they need.  Some changes could include clear descriptions of the available repayment options and a calculator

---

[12] Borrowers who successfully rehabilitate their loans have the default status reported by FSA removed from their credit report and their remaining collection fees are waived.

similar to those available for non-defaulted borrowers to help them understand their options and estimate their monthly payment.[13]

In addition, defaulted student loan borrowers could benefit from a single portal for information to help determine how much they owe, the repayment options available, and who to contact to address their loan.  The portal could include links that clarify which options are available, contact information for their current PCA, and simple online payment forms that allow a borrower to begin or modify a recurring payment.  It could also be used to provide borrowers entering into a rehabilitation agreement with timely information regarding their payment obligations and access to forms that could be completed and signed electronically.

### Navigating the Rehabilitation Process

Rehabilitation provides an affordable option for most borrowers with monthly payments based on discretionary income, but the first year of the pilot has demonstrated that the rehabilitation process can be difficult to complete.  A number of steps are required for borrowers to rehabilitate their defaulted loans: (i) borrowers must submit documentation of their income[14] and Fiscal must verify income information before the monthly payment amount is confirmed and monthly statements are sent to the borrower; (ii) borrowers must make nine on-time payments within a 10-month period;[15] and (iii) borrowers must sign and return a rehabilitation agreement letter.

During the first year of the pilot, 604 borrowers expressed interest in rehabilitating their loans and verbally provided estimated income information; however, borrowers made slow progress toward completing these agreements with only 301 borrowers taking at least one of the additional required actions, such as submitting income documentation or making a payment.  Of the 604 borrowers interested in rehabilitating their loans, more than half (374 borrowers) would have been permitted to make the lowest available monthly payment of $5 based on estimated income that the borrowers provided to Fiscal.[16]  For borrowers who provided the required documentation to verify their income, the average verified monthly payment amount was just under $75.  The average rehabilitation payment received from borrowers to date has been approximately $50.

---

[13] For example, FSA's website provides clear language about repayment plans offered to non-defaulted borrowers, including a "repayment calculator" and eligibility requirements for each repayment option, to allow borrowers to determine the optimal plan for their circumstances.  A second repayment tool allows borrowers with current loans to answer five questions about their circumstances and learn more about potential repayment plans and the steps to enroll in those plans.

[14] The borrower must submit one of the following documents as proof of income: i) a copy of the borrower's most recent federal income tax return (1040) for either of the two previous tax years, ii) an official federal tax transcript (including transcripts provided by the IRS, as authorized by the borrower) for either of the two previous tax years, or iii) a signed Financial Information Statement form listing income and expenses.

[15] Payments must be received 20 days before or after the stated payment due date to be considered on-time.

[16] Many of these borrowers stated that they could not afford a standard rehabilitation payment of 15 percent of their estimated discretionary income and instead sought to pursue a Financial Information Statement (FIS) Rehabilitation that reduces their monthly payment based on documented living expenses such as food, housing, and transportation.

7

**AR 7**

**Table D: Borrower Rehabilitation Agreements[17]**

| Rehabilitation Activity<br>Note: Categories below are not mutually exclusive | Number of Borrowers | Median Balance (dollars in thousands) |
|---|---|---|
| Borrower expressed interest in rehabilitation | 604 | $10 |
| Verbally agreed to rehabilitation, no additional action taken | 303 | $9 |
| Provided income documentation | 117 | $14 |
| Made rehabilitation payments | 279 | $14 |
| Provided signed rehab agreement letter | 42 | $17 |
| Completed rehabilitation | 8 | $18 |

In November 2015, after noting the navigational challenge confronting borrowers, Fiscal established a single-point-of-contact team to work with borrowers and deliver more extensive and regular interaction. Borrowers who initiate the rehabilitation process are assigned to agents who are familiar with individual borrowers' accounts and status in the rehabilitation program and can provide consistent outreach to remind borrowers to provide any missing information. This team has helped to increase the rate at which borrowers are submitting rehabilitation documentation; Fiscal is monitoring the effect of the single-point-of-contact model as the pilot continues.

Simplifying the rehabilitation process by reducing the steps borrowers need to take could potentially ease the burden and increase rehabilitations. For example, there may be opportunities to streamline the process for borrowers to submit forms and provide the income information necessary for loan rehabilitation, such as allowing borrowers to complete and submit forms electronically. In addition, non-defaulted borrowers can use an IRS data retrieval tool to send their income information to their servicer when enrolling in an IDR plan.[18] However, this tool is not currently available for defaulted borrowers.

Fiscal has also found that many borrowers experience difficulties filling out the Financial Information Statement (FIS) form used for rehabilitations that are based on the borrower's income and monthly expenses. The form requires borrowers to provide monthly expenses for 20 categories and include documentation that borrowers are unlikely to have on hand, such as copies of health insurance premium statements. In addition, the form is used for borrowers who do not have income, are self-employed, are not tax filers, or whose income has changed significantly since filing their taxes. Borrowers without income pursuing a standard rehabilitation payment could benefit from a simplified form that allows documentation of lack of income without also providing extensive documentation of monthly living expenses.

---

[17] The data in Table D are sourced from Fiscal's debt management system.
[18] The IRS data retrieval tool allows borrowers to electronically request and authorize the transfer of their income information from their federal income tax return to meet the income documentation requirements of IDR plans.

AR 8

### *Transitioning Borrowers to a Sustainable Repayment Plan Following the Completion of Rehabilitation*

Borrowers face a number of challenges even if they have successfully rehabilitated their loans. Upon completion, FSA transfers the loan(s) from the PCA to a student loan servicer. This transfer usually occurs within a week, but can require up to 60 days if additional processing is required. During this transfer process, borrowers must continue to make monthly payments to the PCA. FSA does not provide rehabilitated borrowers information about which servicer will have their loan until the transfer has already occurred. This lack of clear information during the transition period can cause confusion about where payments should be sent and whom to contact with problems or other questions.[19]

Significantly, borrowers who have rehabilitated their loans have the option of enrolling in an IDR plan with their servicer. However, this option—which could be of considerable benefit to rehabilitated borrowers—requires the borrower to actively choose to enroll in an IDR plan and re-submit income documentation. After the loan is transferred to the servicer, the servicer bills the borrower for the same amount as the rehabilitation payment for up to 90 days in order to allow the borrower to make a repayment selection (and provide required supporting documentation). If the borrower does not successfully enroll in a repayment plan, the loan is automatically entered into a standard payment plan amortized over 10 years, which may result in a significantly higher required monthly payment relative to the payments the borrowers made during rehabilitation. This automated feature could lead to borrowers lapsing back into delinquency and default.

The complexity and confusion are compounded by the fact that the rehabilitation payment options available for defaulted borrowers differ from IDR plans available to borrowers who have rehabilitated their loans or who have never defaulted. The rehabilitation payment amount is based on 15 percent of discretionary income, which is greater than the monthly payment rates currently available to non-defaulted borrowers under Pay As You Earn (PAYE) (10 percent of discretionary income).[20] Defaulted borrowers may lower their monthly payment below 15 percent of discretionary income by entering into a Financial Income Statement rehabilitation (FIS rehabilitation), a rehabilitation in which documented monthly expenses are also taken into account in calculating the monthly payment. However, this option is unique to rehabilitations. In some circumstances a FIS rehabilitation may result in rehabilitation payment amounts less than the 10 percent of discretionary income available in PAYE,[21] and consequently the borrower would face a higher monthly payment after completing rehabilitation.

---

[19] To improve communications with rehabilitated borrowers, FSA's list of future enhancements includes functionality to generate a transfer notification to the borrower identifying the non-default servicer that will begin servicing their rehabilitated loan. In addition, FSA is currently considering how to streamline its non-default loan servicing model during the current effort to re-compete and consolidate its non-default loan servicing contracts.

[20] The federal student loan program includes several IDR plans, including PAYE, in which payments are equal to 10 percent of discretionary income, and Income-Based Repayment, in which payments are equal to 15 percent of discretionary income.

[21] This could be the case for a borrower with sufficiently high income and expenses completing a FIS Rehabilitation.

**AR 9**

Accordingly, further aligning the monthly payment amounts available to defaulted borrowers with those available to non-defaulted borrowers may help to reduce borrower confusion and re-defaults for borrowers that rehabilitate.[22]

***Helping Borrowers Avoid Involuntary Collection Processes such as Administrative Wage Garnishment and the Treasury Offset Program***

Fiscal and FSA are required by law to use all available collection tools as appropriate, including AWG.  In the cross-servicing program, Fiscal has access to wage and employment information and has found that initiating AWG can lead to higher contact rates.

Fiscal intentionally did not use AWG during the first 11 months of the pilot in order to attempt to engage borrowers and resolve their loans voluntarily.  Toward the end of the first year of the pilot, Fiscal began sending garnishment notice letters to borrowers with whom it has been unable to establish a repayment agreement and for whom it has employment information.  Fiscal sent notice letters to 1,985 borrowers through the end of February 2016.  These letters explained the AWG process and how the borrower could avoid it.

During the pilot, FSA has also submitted borrowers' defaulted loans to TOP, as required by law. TOP centrally collects delinquent debts by withholding certain federal and state payments owed to the defaulted borrower, including tax refund payments.

While it is too early to determine whether these tools substantially increase collections, both collection tools— offsets through TOP and the issuance of AWG notice letters and garnishment orders— resulted in an increase in the daily volume of inbound calls as borrowers called to inquire about tax refunds offset through TOP, ways to avoid AWG, and their available repayment options.  The average number of daily inbound calls increased from 13 calls per day during the first 11 months of the pilot to 37 calls per day during February 2016.

Of the 1,985 borrowers who were sent garnishment notices by February 2016, 443 individuals (22 percent) subsequently contacted Fiscal, and 218 individuals (11 percent) entered into a repayment agreement.  However, many borrowers did not respond to the garnishment notice and have been or will be subject to wage garnishment.  Data regarding the impact of AWG initiation and TOP offsets will continue to be evaluated throughout the remainder of the pilot.

## IV.    CONCLUSION

The pilot, while incomplete and still in progress, provides government agencies with first-hand experience and insights regarding how to communicate with people who have defaulted on their student loans and how to enhance the federal student loan finance system.  In the second year of the pilot, Fiscal will continue working to find ways to increase borrower contact and effectively counsel borrowers on how to evaluate and implement the best options for resolving their defaulted student loans.  Additionally, for borrowers in the pilot who already have enrolled in

---

[22] Altering the terms of repayment options available for defaulted loans may require changes to laws or regulations.

**AR 10**

payment agreements, Fiscal will provide assistance as these borrowers complete the program requirements.

The pilot has already helped provide insight into many of the challenges in collecting defaulted student loans and will continue to allow Fiscal and FSA to gather more information about the process, gain further insights, and identify opportunities to better help borrowers and service student loans.  Ongoing collaboration will allow the opportunity for Fiscal to share its findings with FSA and assess potential process improvements to determine whether they should be adopted in the collection of federal student loans.  Further pilots that engage borrowers who have not yet defaulted also offer the promise of considering potential enhancements to the federal student loan finance system.

AR 12

| | |
|---|---|
| **From:** | LaVia, Mark |
| **To:** | Aldridge, Murthlyn |
| **Cc:** | Leith, William; Curran, Frank D.; Bumgarner, Bradley; Bradfield, Patrick |
| **Subject:** | RE: RE: Default Management Approach |
| **Date:** | Thursday, May 03, 2018 12:41:32 PM |
| **Attachments:** | FSA_Strategy_Document.pdf |
| | BackupDocs.zip |

Murthlyn.

Sorry let's try this again – this time with the back-up information.

Mark

---

**From:** LaVia, Mark
**Sent:** Thursday, May 03, 2018 12:38 PM
**To:** Aldridge, Murthlyn
**Cc:** Leith, William; Curran, Frank D.; Bumgarner, Bradley; Bradfield, Patrick
**Subject:** RE: Default Management Approach

Good afternoon Murthlyn –

Please find attached our new approach to Default Management.

Thank you.

Mark

## Mark LaVia

U.S. Department of Education
Federal Student Aid
Business Operations
Executive Director, Servicing
Work – 202-377-3588
Mobile – 202-805-4376

**AR 13**

May 3 2018          INTERNAL – FOR DISCUSSION ONLY

**Planned Changes to FSA's Borrower Default Management Practices**

**Impact on FSA's Need for Debt Collection Services**

Recently, new FSA leadership announced a new vision of Federal Student Aid student loan processing and servicing. FSA started to examine existing processes, practices, and approaches to determine areas for improvement and new ways of managing student loan servicing.

This document reflects the result of FSA's evaluation of its current practices to manage student loan delinquencies, with the goal of delivering better services to borrowers while also identifying ways to reduce defaults, minimize risks, improve the safeguarding of borrower's data, and satisfying the Debt Collection Improvement Act (DCIA) of 1996.

As explained below, the implementation of this plan will lead to significant reductions in the volume of accounts held in FSA's Debt Management and Collections System (DMCS) and consequently in the need for debt collection services as presently procured.

## Current Practice

FSA currently manages the Federally-held student aid portfolio based upon the borrowers' delinquency status, with accounts delinquent less than 360 days being serviced by 10 "non-defaulted servicers" (including TIVAS, NFPs and Perkins) while loans that have gone greater than 360 days delinquent are assigned to the DMCS. Loans held in DMCS are then periodically assigned to one of the Private Collection Agencies (PCAs) with active contracts who perform collection and other default resolution activities.

The non-defaulted servicers provide all servicing activity from the date of loan origination to the date a borrower account becomes greater than 360 days delinquent. During this time period, these servicers provide counseling to borrowers both while in school and after entering repayment. Further, these servicers participate in collection activities, skip tracing, processing of deferment, forbearance, and discharge requests. Non-defaulted servicers are paid based on the status of each account and receive higher rates for borrower accounts that are current than those that are delinquent or in a non-paying status.

Once a borrower account reaches 361 days delinquent the loan is assigned (transferred) into the defaulted portfolio (DMCS) and serviced by defaulted service-providers. No involuntary payment actions, such as the Treasury Offset Program (TOP)  are taken on borrower accounts while being serviced by non-defaulted servicers.

The current federally-held portfolio consists of approximately 39.2 million borrowers, 32 million of those borrowers are serviced by non-defaulted servicers[1] and the remaining 7.2 million are serviced within the DMCS defaulted portfolio.[2] Of those 7.2 million borrowers in DMCS, most of

---

[1] 03_ALL_Performance Tracking Summary - 0318.xlsx (cell C17)
[2] 02_DMCS Inventory Report All Workgroups April 2018.xlsx (cells F115 + G115)

May 3 2018          INTERNAL – FOR DISCUSSION ONLY

them are currently placed with one of the PCAs. The PCAs attempt to contact the borrower and work to resolve the debt by payment, rehabilitation, consolidation and/or an involuntary payment programs such as Administrative Wage Garnishment (AWG). These borrowers do not have access to deferments or forbearances as they would if they were with a non-default servicer. Once a loan is rehabilitated it is transferred out of DMCS to one of the non-default servicers.

Currently about 5.8 million[3] of the defaulted portfolio are being serviced by 18 PCAs (11 Small Businesses and 7 Award Term Extension ATEs) with 2.5 million[4] of those borrowers being serviced by 5 of the 7 ATE PCAs whose contracts expire in April 2019. On average the number of borrower accounts eligible for PCA placement is 120,000 per month[5].

## Planned Changes to Current Practice

In an effort to reduce the volume of borrowers that default, improve assistance to delinquent borrowers, and lower overall delinquency levels FSA plans to modify significantly its current practices. Specifically, FSA plans to implement an enhanced servicing concept that will focus on the resolution of delinquency and providing collection activities for borrower accounts once they have reached 90 days of delinquency. The plan is to expand upon the current processes used to support borrower accounts > 90 days delinquent and provide higher levels of enhanced servicing to this cohort using the most current and efficient resolution techniques available. Borrowers will remain with the servicer until the debt is repaid instead of being assigned to the default servicer as is done currently. All proposed changes to current collection practices will be reviewed to ensure legal compliance with the HEA, Department and Treasury regulations, and other applicable regulations before they are implemented.

Once implemented,  the vendor(s) executing this process must demonstrate to FSA's satisfaction they possess a full and complete understanding of all programmatic, regulatory, and statutory aspects of servicing loans in repayment including all entitlements (like deferments, forbearances, repayment plans, discharge/forgiveness, etc.) as well as all methods of collection and default resolutions (including typical collections outreach done to borrowers prior to involuntary collections as well as post default collections, AWG, and TOP). The vendor(s) will have staff trained and dedicated to managing accounts that are 90 days delinquent and they will be focused on providing a higher level of service for borrowers in financial distress.

This enhanced servicing concept would focus on assisting the borrower with getting into a repayment plan they can afford such as Income Driven Repayment (IDR) plans and/or extended term plans. This plan will provide additional communications to borrowers on how they can avoid delinquency, default, and what programs may be available to borrowers (i.e. PSLF, Closed School, Disability, etc.). There will be an increased focus on outreach to borrowers and enhanced levels of skip tracing to locate borrower contact information to allow for communications. Many of borrowers assigned to the defaulted portfolio today do not have valid

---

[3] 01_DMCS Inventory Report PCA Workgroups April 2018.xlsx (cell H21)
[4] 01_DMCS Inventory Report PCA Workgroups April 2018.xlsx (cells H2 + H4 + H6 + H7 + H11)
[5] 04_Allocations March 2018.xlsx (cell o2 – sample  of total for March 2018)

contact information and therefore may not be receiving communications to effectively manage their debt.

## Benefits of the Plan

Implementing enhanced servicing for accounts beginning at 90-days of delinquency and having the servicer continue to service delinquent accounts through the life of the debt will generate significant benefits for the federal government and for borrowers.

**Reduction in volume of defaulted borrowers:**  Implementing enhanced servicing practices dedicated to resolve delinquency (>90 days to 270 days) prior to, and after, reaching default (>270 days) will help to reduce the number of borrowers who default on their debts. Implementing enhanced servicing with an emphasis on borrowers 90 or more days delinquent will focus on applying and updating best practices to achieve reductions in borrower defaults and improve the ability of borrowers to repay their debts.  Also, the vendor(s) will be able to utilize collection tools sooner into a borrower's delinquency period, thereby increasing the likelihood of initiating borrower contact and resolving the debt sooner.  This was a finding from a Treasury Fiscal Service – Education Federal Student Aid pilot study for servicing defaulted student loan debt.[6]

**Improved Customer Service:**  Using additional improved practices specifically dedicated to resolve delinquency prior to reaching default will provide improvements in customer service to borrowers less than 90 days delinquent and provide a higher level of service to those borrowers in financial distress.  Reports have identified certain borrower needs such as IDR plans, recertification of income, and eligibility/requirements for forgiveness as areas for improvement at FSA.

**Compliance with DCIA**: This new process for managing delinquent and defaulted borrowers will help FSA become compliant with the DCIA by referring delinquent ED-held debt to the U.S. Department of Treasury for their TOP at 270 days of delinquency.  Becoming compliant will resolve IG audit findings and eliminate the need for the Secretary to self-report this non-compliance to Congress and the public every year in the Department's Agency Financial Report.

**Decreased security risks:**  By reducing the need to assign borrower accounts to the default servicers it will reduce the number of servicers with access to the student loan portfolio, and therefore decrease the amount of borrower data being moved among multiple vendors reducing the risk of data breaches and other system vulnerabilities. The need to consistently provide improved security is always a high priority with FSA and ED.

**Decreased Costs:**  Reductions in the volume of delinquent accounts will provide reduced costs for servicing these accounts.  As of December 2017, there was $125.3 billion in ED-held

---

[6] https://www.treasury.gov/connect/blog/Pages/An-Update-on-the-Fiscal-Federal-Student-Aid-Pilot-for-Servicing-Defaulted-Student-Loan-Debt.aspx

defaulted debt, a 19% growth of $20.2 billion since December 2016.[7]  Only a 4% reduction in the current amount of defaulted debt, or an avoidance of 4% out the 19% growth, would save the Federal government a billion dollars in estimated program costs.

## Impacts of the Plan on existing default servicers

These vendors would continue to service the current default portfolio ($125.3 billion as of December 2017), however, that portfolio would begin to decrease as soon as the enhanced servicing practices are put in place. A significantly reduced volume of borrowers would be added to the defaulted portfolio (instead the borrowers would be serviced by the vendor(s) providing enhanced servicing practices). Once the enhanced servicing practices are in place, a plan would be put in place to transfer the existing volume of the default portfolio to be serviced by that vendor(s). The default servicers would eventually no longer be needed.

The existing PCAs have the capacity to manage the existing default portfolio[8] and would continue to provide support for those borrowers throughout the transition to the new strategy.

---

[7] https://studentaid.ed.gov/sa/about/data-center/student/portfolio
[8] 05_AccountCapacityasof 0328018.xlsx

| Workgroup | Workgroup Value | Portfolio Size in Dollars | Portfolio Size in Borrowers < $0 | Portfolio Size in Borrowers $0 | Portfolio Size in Borr | Portfolio Size in Borrowers >= $25 | Total Portfolio Size in Borrowers |
|---|---|---|---|---|---|---|---|
| Account Control Technology, Inc. | PCA0001A | $9,373,746,362 | 74 | 29 | 360 | 534,851 | 535,314 |
| Coast Professional, Inc. | PCA0003A | $9,538,672,454 | 74 | 36 | 228 | 483,906 | 484,244 |
| ConServe | PCA0007A | $8,863,493,758 | 67 | 53 | 336 | 490,002 | 490,458 |
| ERS | PCA0010A | $3,973,485,533 | 21 | 12 | 28 | 178,939 | 179,000 |
| FMS Investment Corp | PCA0012A | $9,170,738,235 | 76 | 23 | 346 | 511,891 | 512,341 |
| GC Services LP | PCA0013A | $8,648,197,357 | 58 | 25 | 314 | 490,516 | 490,922 |
| Immediate Credit Recovery, Inc. | PCA0014A | $10,664,734,556 | 91 | 36 | 266 | 562,928 | 563,320 |
| National Recoveries, Inc. | PCA0015A | $9,426,363,342 | 77 | 31 | 226 | 473,154 | 473,488 |
| Pioneer Credit Recovery, Inc | PCA0017A | $3,922,285,178 | 27 | 14 | 33 | 176,393 | 176,467 |
| Windham Professionals, Inc. | PCA0023A | $7,101,055,353 | 72 | 17 | 272 | 489,866 | 490,227 |
| Action Financial Services | PCA0025A | $4,235,639,518 | 41 | 26 | 116 | 217,256 | 217,441 |
| Bass & Associates | PCA0026A | $1,956,106,296 | 18 | 9 | 43 | 98,713 | 98,781 |
| Central Research | PCA0027A | $4,352,442,522 | 38 | 17 | 80 | 214,216 | 214,342 |
| Credit Adjustments | PCA0028A | $6,289,393,943 | 47 | 37 | 142 | 311,815 | 312,041 |
| FH CANN & Associates | PCA0029A | $3,657,820,889 | 31 | 17 | 67 | 177,886 | 178,021 |
| National Credit Services | PCA0030A | $2,734,772,511 | 26 | 12 | 61 | 135,605 | 135,704 |
| Professional Bureau of Collections of Maryland | PCA0031A | $2,608,296,883 | 14 | 11 | 42 | 127,706 | 127,727 |
| Reliant Capital Solutions | PCA0032A | $3,208,751,465 | 39 | 12 | 54 | 156,556 | 156,661 |
| | **Totals** | **$109,725,996,157** | **891** | **417** | **3,014** | **5,832,199** | **5,836,537** |

| Workgroup | Workgroup Value | Portfolio Size in Dollars | Portfolio Size in Borrowers < $0 | Portfolio Size in Borrowers $0 | Portfolio Size in Borrowers $.01 to $24.99 | Portfolio Size in Borrowers >= $25 | Total Portfolio Size in Borrowers |
|---|---|---|---|---|---|---|---|
| Default workgroup | DfltWkgp | $21,222,947,932 | 123,833 | 3,428,172 | 90,340 | 1,284,515 | 4,926,860 |
| Department of Justice Alaska, USA | DOJAK04A | $1,189,032 | 0 | 3 | 0 | 15 | 18 |
| Department of Justice Alabama, USA | DOJAL01A | $766,850 | 0 | 0 | 0 | 8 | 8 |
| Department of Justice Alabama, USA | DOJAL02A | $1,182,744 | 0 | 1 | 0 | 11 | 12 |
| Department of Justice Alabama, USA | DOJAL03A | $1,020,733 | 0 | 1 | 0 | 21 | 22 |
| Department of Justice Arkansas, USA | DOJAR06A | $1,898,861 | 0 | 2 | 0 | 26 | 28 |
| Department of Justice Arkansas, USA | DOJAR07A | $448,610 | 0 | 0 | 0 | 7 | 7 |
| Department of Justice Arizona, USA | DOJAZ05A | $4,370,621 | 0 | 14 | 0 | 58 | 72 |
| Department of Justice California, USA | DOJCA08A | $162,782,902 | 26 | 550 | 1 | 10,399 | 10,975 |
| Department of Justice California, USA | DOJCA09A | $4,661,638 | 1 | 0 | 0 | 68 | 69 |
| Department of Justice California, USA | DOJCA10A | $33,439,356 | 5 | 255 | 0 | 1,936 | 2,196 |
| Department of Justice California, USA | DOJCA11A | $4,816,600 | 0 | 7 | 0 | 97 | 104 |
| Department of Justice Colorado, USA | DOJCO12A | $372,736 | 0 | 0 | 0 | 8 | 8 |
| Department of Justice Connecticut, USA | DOJCT13A | $2,294,267 | 0 | 1 | 0 | 25 | 26 |
| Department of Justice District of Columbia, USA | DOJDC15A | $11,903,039 | 2 | 57 | 0 | 886 | 945 |
| Department of Justice Delaware, USA | DOJDE14A | $356,628 | 0 | 0 | 0 | 4 | 4 |
| Department of Justice Florida, USA | DOJFL16A | $65,203,253 | 1 | 61 | 0 | 2,574 | 2,636 |
| Department of Justice Florida, USA | DOJFL17A | $2,948,916 | 0 | 7 | 0 | 75 | 82 |
| Department of Justice Florida, USA | DOJFL18A | $67,730,199 | 0 | 152 | 0 | 3,468 | 3,620 |
| Department of Justice Georgia, USA | DOJGA19A | $415,011 | 0 | 0 | 0 | 6 | 6 |
| Department of Justice Georgia, USA | DOJGA20A | $11,190,891 | 0 | 5 | 0 | 145 | 150 |
| Department of Justice Georgia, USA | DOJGA21A | $949,809 | 0 | 0 | 0 | 10 | 10 |
| Department of Justice Guam & Northern Mariana Islands, USA | DOJGU22A | $10,590 | 0 | 0 | 0 | 1 | 1 |
| Department of Justice Hawaii, USA | DOJHI23A | $1,184,408 | 0 | 1 | 0 | 19 | 20 |
| Department of Justice Iowa, USA | DOJIA30A | $558,433 | 0 | 10 | 0 | 10 | 20 |
| Department of Justice Iowa, USA | DOJIA31A | $1,808,054 | 0 | 8 | 0 | 19 | 27 |
| Department of Justice Idaho, USA | DOJID24A | $2,005,255 | 0 | 0 | 0 | 19 | 19 |
| Department of Justice Illinois, USA | DOJIL25A | $2,391,909 | 0 | 1 | 0 | 20 | 21 |
| Department of Justice Illinois, USA | DOJIL26A | $25,423,003 | 0 | 74 | 1 | 997 | 1,072 |
| Department of Justice Illinois, USA | DOJIL27A | $1,367,780 | 0 | 1 | 0 | 8 | 9 |
| Department of Justice Indiana, USA | DOJIN28A | $1,221,385 | 0 | 1 | 0 | 17 | 19 |

| Workgroup | Workgroup Value | Portfolio Size in Dollars | Portfolio Size in Borrowers < $0 | Portfolio Size in Borrowers $0 | Portfolio Size in Borrowers $.01 to $24.99 | Portfolio Size in Borrowers >= $25 | Total Portfolio Size in Borrowers |
|---|---|---|---|---|---|---|---|
| Department of Justice Indiana, USA | DOIIN29A | $4,267,527 | 0 | 3 | 0 | 65 | 68 |
| Department of Justice Kansas, USA | DOIKS32A | $1,725,098 | 0 | 7 | 0 | 17 | 24 |
| Department of Justice Kentucky, USA | DOIKY33A | $823,939 | 0 | 5 | 0 | 14 | 19 |
| Department of Justice Kentucky, USA | DOIKY34A | $2,246,834 | 0 | 2 | 0 | 52 | 54 |
| Department of Justice Louisiana, USA | DOILA35A | $3,798,658 | 0 | 3 | 0 | 79 | 82 |
| Department of Justice Louisiana, USA | DOILA36A | $1,461,139 | 0 | 1 | 0 | 14 | 15 |
| Department of Justice Louisiana, USA | DOILA37A | $3,405,284 | 1 | 2 | 0 | 32 | 35 |
| Department of Justice Massachusetts, USA | DOIMA40A | $5,428,223 | 0 | 2 | 0 | 70 | 72 |
| Department of Justice Maryland, USA | DOIMD39A | $2,302,376 | 1 | 4 | 0 | 50 | 55 |
| Department of Justice Maine, USA | DOIME38A | $937,126 | 0 | 3 | 0 | 15 | 18 |
| Department of Justice Michigan, USA | DOIMI41A | $62,339,360 | 14 | 279 | 0 | 5,061 | 5,354 |
| Department of Justice Michigan, USA | DOIMI42A | $1,990,597 | 0 | 0 | 5 | 32 | 37 |
| Department of Justice Minnesota, USA | DOIMN43A | $3,416,172 | 0 | 36 | 0 | 53 | 89 |
| Department of Justice Missouri, USA | DOIMO46A | $3,977,242 | 1 | 18 | 0 | 41 | 60 |
| Department of Justice Missouri, USA | DOIMO47A | $815,464 | 0 | 12 | 0 | 19 | 31 |
| Department of Justice Mississippi, USA | DOIMS44A | $1,498,486 | 0 | 1 | 1 | 20 | 22 |
| Department of Justice Mississippi, USA | DOIMS45A | $1,267,729 | 0 | 3 | 0 | 21 | 24 |
| Department of Justice Montana, USA | DOIMT48A | $551,667 | 0 | 3 | 0 | 13 | 16 |
| Department of Justice North Carolina, USA | DOINC58A | $2,627,014 | 0 | 4 | 0 | 34 | 38 |
| Department of Justice North Carolina, USA | DOINC59A | $1,867,471 | 0 | 2 | 0 | 20 | 22 |
| Department of Justice North Carolina, USA | DOINC60A | $1,993,682 | 0 | 0 | 0 | 25 | 25 |
| Department of Justice North Dakota, USA | DOIND61A | $332,003 | 0 | 1 | 0 | 5 | 6 |
| Department of Justice Nebraska, USA | DOINE49A | $867,468 | 0 | 5 | 0 | 16 | 21 |
| Department of Justice New Hampshire, USA | DOINH51A | $186,711 | 0 | 0 | 0 | 10 | 10 |
| Department of Justice New Jersey, USA | DOINJ52A | $13,230,809 | 0 | 10 | 0 | 438 | 448 |
| Department of Justice New Mexico, USA | DOINM53A | $567,664 | 0 | 8 | 0 | 17 | 25 |
| Department of Justice Nevada, USA | DOINV50A | $892,508 | 0 | 3 | 0 | 25 | 28 |
| Department of Justice New York, USA | DOINY54A | $51,670,747 | 10 | 308 | 1 | 3,796 | 4,115 |
| Department of Justice New York, USA | DOINY55A | $5,699,046 | 0 | 7 | 0 | 241 | 248 |
| Department of Justice New York, USA | DOINY56A | $8,350,193 | 0 | 8 | 0 | 118 | 126 |
| Department of Justice New York, USA | DOINY57A | $3,196,484 | 0 | 2 | 0 | 67 | 69 |
| Department of Justice Ohio, USA | DOIOH62A | $4,642,506 | 0 | 11 | 0 | 79 | 90 |

| Workgroup | Workgroup Value | Portfolio Size in Dollars | Portfolio Size in Borrowers < $0 | Portfolio Size in Borrowers $0 | Portfolio Size in Borrowers $.01 to $24.99 | Portfolio Size in Borrowers >= $25 | Total Portfolio Size in Borrowers |
|---|---|---|---|---|---|---|---|
| Department of Justice Ohio, USA | DOJOH63A | $5,552,501 | 0 | 0 | 10 | 141 | 151 |
| Department of Justice Oklahoma, USA | DOJOK64A | $435,522 | 0 | 0 | 0 | 7 | 7 |
| Department of Justice Oklahoma, USA | DOJOK65A | $942,088 | 0 | 1 | 1 | 10 | 12 |
| Department of Justice Oklahoma, USA | DOJOK66A | $3,210,283 | 0 | 0 | 3 | 26 | 29 |
| Department of Justice Oregon, USA | DOJOR67A | $1,382,861 | 0 | 0 | 2 | 17 | 19 |
| Department of Justice Pennsylvania, USA | DOJPA68A | $9,483,933 | 0 | 0 | 23 | 373 | 396 |
| Department of Justice Pennsylvania, USA | DOJPA69A | $2,452,573 | 0 | 0 | 1 | 26 | 27 |
| Department of Justice Pennsylvania, USA | DOJPA70A | $4,659,468 | 1 | 0 | 9 | 145 | 151 |
| Department of Justice Puerto Rico, USA | DOJPR71A | $1,056,351 | 0 | 0 | 11 | 16 | 27 |
| Department of Justice Rhode Island, USA | DOJRI72A | $1,070,674 | 0 | 0 | 3 | 19 | 22 |
| Department of Justice South Carolina, USA | DOJSC73A | $10,578,454 | 0 | 0 | 2 | 241 | 243 |
| Department of Justice South Dakota, USA | DOJSD74A | $508,643 | 0 | 0 | 0 | 4 | 4 |
| Department of Justice Tennessee, USA | DOJTN75A | $1,066,660 | 0 | 0 | 1 | 22 | 24 |
| Department of Justice Tennessee, USA | DOJTN76A | $1,544,015 | 0 | 0 | 3 | 32 | 37 |
| Department of Justice Tennessee, USA | DOJTN77A | $2,041,703 | 0 | 0 | 3 | 36 | 39 |
| Department of Justice Texas, USA | DOJTX78A | $685,961 | 0 | 0 | 1 | 21 | 22 |
| Department of Justice Texas, USA | DOJTX79A | $13,300,701 | 0 | 0 | 14 | 338 | 352 |
| Department of Justice Texas, USA | DOJTX80A | $48,168,465 | 8 | 2 | 216 | 3,242 | 3,468 |
| Department of Justice Texas, USA | DOJTX81A | $12,253,108 | 1 | 0 | 54 | 141 | 196 |
| Department of Justice Utah, USA | DOJUT82A | $895,857 | 0 | 0 | 4 | 17 | 21 |
| Department of Justice, Virginia USA | DOJVA85A | $1,544,507 | 0 | 0 | 1 | 17 | 18 |
| Department of Justice Virginia, USA | DOJVA86A | $362,384 | 0 | 0 | 0 | 5 | 5 |
| Department of Justice Vermont, USA | DOJVT83A | $146,277 | 0 | 0 | 1 | 4 | 5 |
| Department of Justice Washington, USA | DOJWA87A | $1,119,700 | 1 | 0 | 3 | 14 | 18 |
| Department of Justice Washington, USA | DOJWA88A | $1,391,264 | 0 | 0 | 4 | 21 | 25 |
| Department of Justice Wisconsin, USA | DOJWI91A | $1,351,388 | 1 | 0 | 1 | 14 | 16 |
| Department of Justice Wisconsin, USA | DOJWI92A | $1,152,055 | 0 | 0 | 3 | 13 | 16 |
| Department of Justice West Virginia, USA | DOJWV89A | $677,326 | 0 | 0 | 1 | 6 | 7 |
| Department of Justice West Virginia, USA | DOJWV90A | $790,156 | 0 | 0 | 0 | 8 | 8 |
| Department of Justice Wyoming, USA | DOJWY93A | $439,708 | 0 | 0 | 0 | 10 | 10 |
| Federal Student Aid | FSAA | $106,772 | 0 | 0 | 50 | 0 | 50 |
| Account Control Technology, Inc. | PCA0001A | $9,373,746,362 | 74 | 29 | 360 | 534,851 | 535,319 |

| Workgroup | Workgroup Value | Portfolio Size in Dollars | Portfolio Size in Borrowers < $0 | Portfolio Size in Borrowers $0 | Portfolio Size in Borrowers $.01 to $24.99 | Portfolio Size in Borrowers >= $25 | Total Portfolio Size in Borrowers |
|---|---|---|---|---|---|---|---|
| Coast Professional, Inc. | PCA0003A | $9,538,672,454 | 74 | 36 | 228 | 483,906 | 484,244 |
| ConServe | PCA0007A | $8,863,493,758 | 67 | 53 | 336 | 490,002 | 490,458 |
| ERS | PCA0010A | $3,973,485,533 | 21 | 12 | 28 | 178,939 | 179,000 |
| FMS Investment Corp | PCA0012A | $9,170,738,235 | 76 | 23 | 346 | 511,891 | 512,336 |
| GC Services LP | PCA0013A | $8,648,197,357 | 58 | 25 | 314 | 490,516 | 490,913 |
| Immediate Credit Recovery, Inc. | PCA0014A | $10,664,734,556 | 91 | 36 | 266 | 562,928 | 563,321 |
| National Recoveries, Inc. | PCA0015A | $9,426,363,342 | 77 | 31 | 226 | 473,154 | 473,488 |
| Pioneer Credit Recovery, Inc | PCA0017A | $3,922,285,178 | 27 | 14 | 33 | 176,393 | 176,467 |
| Windham Professionals, Inc. | PCA0023A | $7,101,055,353 | 72 | 17 | 272 | 489,866 | 490,227 |
| Action Financial Services | PCA0025A | $4,235,639,518 | 41 | 26 | 116 | 217,256 | 217,439 |
| Bass & Associates | PCA0026A | $1,956,106,296 | 18 | 9 | 43 | 98,713 | 98,783 |
| Central Research | PCA0027A | $4,352,442,522 | 38 | 17 | 80 | 214,216 | 214,351 |
| Credit Adjustments | PCA0028A | $6,289,393,943 | 47 | 37 | 142 | 311,815 | 312,041 |
| FH CANN & Associates | PCA0029A | $3,657,820,889 | 31 | 17 | 67 | 177,886 | 178,001 |
| National Credit Services | PCA0030A | $2,734,772,511 | 26 | 12 | 61 | 135,605 | 135,704 |
| Professional Bureau of Collections of Maryland | PCA0031A | $2,608,296,883 | 14 | 11 | 42 | 127,706 | 127,773 |
| Reliant Capital Solutions | PCA0032A | $3,208,751,465 | 39 | 12 | 54 | 156,556 | 156,661 |
| | **Totals** | **$131,693,606,187** | **124,798** | **3,430,979** | **93,360** | **7,153,224** | **10,802,361** |

## TIVAS/NFP Portfolio - March month end 2018

| Performance Category | Category | TOTAL | % | Great Lakes | | Fed Loan | | Navient | | NELNET | | MOHELA | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0001 | Borrowers in In-School Status | 7,243,537 | 22.67% | 1,631,358 | 21.88% | 1,059,813 | 14.33% | 992,814 | 16.46% | 1,245,249 | 21.50% | 659,051 | 32.69% |
| 0002 | Borrowers in Grace Status | 1,100,969 | 3.45% | 216,725 | 2.91% | 155,140 | 2.10% | 159,813 | 2.65% | 203,985 | 3.52% | 103,726 | 5.15% |
| 0003 | Borrowers in Repayment (0-5 days delq) | 14,233,025 | 44.54% | 3,463,342 | 46.46% | 3,650,886 | 49.37% | 2,816,946 | 46.71% | 2,683,116 | 46.32% | 882,500 | 43.78% |
| 0004 | Borrowers as Service Members | 152,594 | 0.48% | 39,493 | 0.53% | 38,359 | 0.52% | 30,217 | 0.50% | 30,270 | 0.52% | 6,000 | 0.30% |
| 0005 | Borrowers in Deferment | 1,796,036 | 5.62% | 408,030 | 5.47% | 367,672 | 4.97% | 325,500 | 5.40% | 338,928 | 5.85% | 111,202 | 5.52% |
| 0006 | Borrowers in Forbearance | 3,903,247 | 12.21% | 955,204 | 12.81% | 1,083,729 | 14.66% | 966,531 | 16.03% | 645,405 | 11.14% | 111,437 | 5.53% |
| 0007 | Borrowers 6-30 Days Delinquent | 996,795 | 3.12% | 233,810 | 3.14% | 321,296 | 4.34% | 166,607 | 2.76% | 180,045 | 3.11% | 35,973 | 1.78% |
| 0008 | Borrowers 31-90 Days Delinquent | 950,928 | 2.98% | 169,440 | 2.27% | 253,835 | 3.43% | 226,946 | 3.76% | 188,937 | 3.26% | 45,094 | 2.24% |
| 0009 | Borrowers 91-150 Days Delinquent | 612,814 | 1.92% | 131,788 | 1.77% | 159,924 | 2.16% | 154,617 | 2.56% | 98,723 | 1.70% | 27,520 | 1.37% |
| 0010 | Borrowers 151-270 Days Delinquent | 623,408 | 1.95% | 136,849 | 1.84% | 177,662 | 2.40% | 129,108 | 2.14% | 118,742 | 2.05% | 23,160 | 1.15% |
| 0011 | Borrowers 271 - 360 Days Delinquent | 301,709 | 0.94% | 64,380 | 0.86% | 107,443 | 1.45% | 51,852 | 0.86% | 53,912 | 0.93% | 8,997 | 0.45% |
| 0012 | Borrowers 361 or more Days Delinquent | 40,293 | 0.13% | 3,812 | 0.05% | 18,895 | 0.26% | 9,940 | 0.16% | 5,077 | 0.09% | 1,219 | 0.06% |
| | TOTAL Borrowers | 31,955,355 | | 7,454,231 | | 7,394,654 | | 6,030,891 | | 5,792,389 | | 2,015,879 | |

TIVAS/NFP Portfolio - March month en

| Performance Category | Category | HESC/ESA | | CS | | GSMR | | OSLA | |
|---|---|---|---|---|---|---|---|---|---|
| 0001 | Borrowers in In-School Status | 558,695 | 42.74% | 432,251 | 58.32% | 369,860 | 53.20% | 294,446 | 56.21% |
| 0002 | Borrowers in Grace Status | 89,028 | 6.81% | 58,068 | 7.83% | 64,713 | 9.31% | 49,771 | 9.50% |
| 0003 | Borrowers in Repayment (0-5 days delq) | 420,931 | 32.20% | 112,433 | 15.17% | 126,386 | 18.18% | 76,485 | 14.60% |
| 0004 | Borrowers as Service Members | 3,456 | 0.26% | 1,808 | 0.24% | 1,702 | 0.24% | 1,289 | 0.25% |
| 0005 | Borrowers in Deferment | 78,327 | 5.99% | 74,960 | 10.11% | 49,125 | 7.07% | 42,292 | 8.07% |
| 0006 | Borrowers in Forbearance | 80,531 | 6.16% | 12,701 | 1.71% | 24,554 | 3.53% | 23,155 | 4.42% |
| 0007 | Borrowers 6-30 Days Delinquent | 20,618 | 1.58% | 15,168 | 2.05% | 14,641 | 2.11% | 8,637 | 1.65% |
| 0008 | Borrowers 31-90 Days Delinquent | 24,020 | 1.84% | 11,312 | 1.53% | 20,066 | 2.89% | 11,278 | 2.15% |
| 0009 | Borrowers 91-150 Days Delinquent | 12,981 | 0.99% | 10,557 | 1.42% | 10,112 | 1.45% | 6,592 | 1.26% |
| 0010 | Borrowers 151-270 Days Delinquent | 12,579 | 0.96% | 8,547 | 1.15% | 10,093 | 1.45% | 6,668 | 1.27% |
| 0011 | Borrowers 271 - 360 Days Delinquent | 5,649 | 0.43% | 3,159 | 0.43% | 3,674 | 0.53% | 2,643 | 0.50% |
| 0012 | Borrowers 361 or more Days Delinquent | 372 | 0.03% | 194 | 0.03% | 242 | 0.03% | 542 | 0.10% |
| | TOTAL Borrowers | 1,307,187 | | 741,158 | | 695,168 | | 523,798 | |

| | Action Financial | Bass & Associates | Central Research | Credit Adjustiment | FH Cann & Associates | Professional Bureau of Collections of MD | Reliant Capital Solutions | Immediate Credit Recovery | National Credit Services | National Recoveries | Coast Professional | Alltran Education Inc. | Pioneer Credit | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| March | 6426 | 8568 | 5418 | 21546 | 21546 | 5418 | 10710 | 0 | 8568 | 21546 | 16128 | 25175 | 25175 | 176224 |

04_Allocations March 2018.xlsx

**AR 26**

| | Action Financial | Bass & Associates | Central Research | Credit Adjustment | FH Cann & Associates | Professional Bureau of Collections of MD | Reliant Capital Solutions | Immediate Credit Recovery | National Credit Services | National Recoveries | Coast Professional | Alltran Education Inc. | Pioneer Credit | Totals per month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January 18 | 35,000 | 20,000 | 70,000 | 100,000 | 100,000 | 25,000 | 75,000 | 60,000 | 80,000 | 100,000 | 100,000 | 20,000 | 100,000 | 885,000 |
| February 18 | 30,000 | 30,000 | 70,000 | 100,000 | 100,000 | 25,000 | 75,000 | 100,000 | 40,000 | 100,000 | 75,000 | 25,000 | 100,000 | 840,000 |
| March 18 | 30,000 | 40,000 | 25,000 | 100,000 | 100,000 | 25,000 | 50,000 | - | 40,000 | 100,000 | 75,000 | 40,000 | 125,000 | 720,000 |
| April 18 | 40,000 | 50,000 | 25,000 | 125,000 | 100,000 | 30,000 | 50,000 | - | 45,000 | 100,000 | 75,000 | 50,000 | 150,000 | 800,000 |
| May 18 | 40,000 | 50,000 | 25,000 | 125,000 | 100,000 | 30,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 900,000 |
| June 18 | 40,000 | 50,000 | 25,000 | 125,000 | 100,000 | 30,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 900,000 |
| July 18 | 45,000 | 50,000 | 30,000 | 150,000 | 100,000 | 35,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 935,000 |
| August 18 | 45,000 | 50,000 | 30,000 | 150,000 | 100,000 | 35,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 935,000 |
| September 18 | 50,000 | 50,000 | 30,000 | 150,000 | 100,000 | 35,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 935,000 |
| October 18 | 50,000 | 50,000 | 35,000 | 175,000 | 100,000 | 40,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 970,000 |
| November 18 | 60,000 | 50,000 | 35,000 | 175,000 | 100,000 | 40,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 970,000 |
| December 18 | 60,000 | 50,000 | 35,000 | 200,000 | 100,000 | 40,000 | 50,000 | 100,000 | 50,000 | 100,000 | 60,000 | 60,000 | 150,000 | 995,000 |
| **Total** | **525,000** | **540,000** | **435,000** | **1,675,000** | **1,200,000** | **390,000** | **650,000** | **960,000** | **605,000** | **1,200,000** | **805,000** | **615,000** | **1,675,000** | **11,275,000** |

Revised: 3/28/18

05_AccountCapacityasof 0328018.xlsx

# MEMORANDUM

**TO:**     FILE

**FROM:**    MURTHLYN ALDRIDGE, CONTRACTING OFFICER

**SUBJECT:**  CANCELLATION DECISION – SOLICITATION NO. ED-FSA-16-R-0009 DEBT COLLECTION SERVICES

**DATE:**    05/3/2018

On January 11, 2018, under solicitation No. ED-FSA-16-R-0009 Debt Collection Services, Federal Student Aid (FSA) awarded contracts for Debt Collection Services to Performant Recovery, Inc. and Windham Professionals, Inc.

Subsequent to the issuance of those awards, FSA Business Operations informed FSA Acquisitions that FSA's needs and requirements for servicing student loans in delinquency and default will change significantly in the near future. Based on my review of FSA's revised requirements, I have determined that the contracts awarded under Solicitation ED-FSA-16-R-0009 will not satisfy FSA's new requirements and therefore are no longer needed. FSA's new vision is for an enhanced servicer(s) to provide services to borrowers beginning ninety (90) days after a borrower account becomes delinquent and continue those services through the resolution of any subsequent default. As a result, FSA's need for Private Collection Agency (PCA) services as a function separate from the work provided by the enhanced servicer(s) will diminish rapidly in the coming months and ultimately become nonexistent.

There is presently more than sufficient capacity, through at least 2024 to perform any Debt Collection Services that may be needed during FSA's transition to the new enhanced servicer(s) obviating the need for additional PCA contracts. I have also determined that the current Solicitation did not solicit, and will not meet, the needs and requirements of FSA for the work to be performed by the enhanced servicer(s).

Solicitation No. ED-FSA-16-R-0009 Debt Collection Services was issued with requirements for a Defaulted Service Provider(s) to service borrower accounts that are 360 days or more delinquent. Under the scope of work, the Defaulted Service Provider(s) would contact borrowers and work to resolve their student loan debt via collection of payment(s), rehabilitation, consolidation and/or involuntary payment programs such as Administrative Wage Garnishment (AWG) and Treasury Offset Program (TOP).

One of FSA's goals is to provide and deliver a higher level of services to borrowers. In order to meet this goal, FSA has determined that the focus needs to be on reducing the volume of borrowers that default and improving customer service to delinquent borrowers. In order to achieve this under FSA's new strategy, FSA will need to service borrower accounts starting at 90 days or more delinquent versus 360 days or more delinquent. Based on this change, borrowers who are 90 days or more delinquent will not be kept in the current non-default portfolio. Instead, a new portfolio will be created for all borrower

**AR 27**

accounts that are 90 days or more delinquent. FSA Business Operations has identified significant benefits to the Government and to borrowers from this new approach including: improved customer service, decreased security risks and decreased costs.

As a result of this new approach, FSA will need a contractor(s) that will focus solely on the resolution of delinquencies and collection activities for the new portfolio of work that will be comprised of accounts beginning at 90 or more days delinquency. The contractor(s) will provide all aspects of collection and default resolutions related to servicing borrower accounts in repayment including entitlements such as deferments, forbearances, repayment plans discharge/forgiveness, etc. and the same contractor(s) will be able to handle post default collections such as AWG and TOP. All proposed changes to current collection practices will be reviewed to ensure legal compliance with the Higher Education Act, Department and Treasury regulations, and other applicable regulations before they are implemented.

In addition, based on input from FSA Business Operations, I have determined that the current volume of defaulted borrowers portfolio can be handled successfully by the eleven (11) small business contractors currently providing Debt Collection Services. The eleven (11) small businesses are presently under their base period of performance which ends on September 30, 2019. Thereafter, FSA has the option of extending those contracts for an additional 5 years through September 30, 2024. Presently, the eleven small businesses are capable of handling approximately 750,000 new accounts per month. Specifically, FSA projects that, at most (even without considering the transition to the enhanced servicer(s), FSA would need to place approximately 120,000 accounts on a monthly basis. In short, FSA has more than sufficient capacity under the existing contracts, even if the plan changes or is delayed for a significant period of time.

I note further that there are currently two or more responsible small business concerns that are competitive in terms of market prices, quality, and delivery. Therefore, if there is a need to solicit for additional contractors to handle this portfolio while FSA transitions to its new strategy, the Department would also consider whether such work should be appropriately set-aside for small business concerns.

Based on the information above, as the Contracting Officer, I have determined that Solicitation No. ED-FSA-16-R-0009 Debt Collection Services no longer accurately reflects FSA's needs and requirements and any amendment proposed would be so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them. Therefore in accordance with FAR 15.206(e) – Amending the Solicitation, I have determined that the cancellation of this Solicitation and the issuance of a new Solicitation that more accurately reflects FSA's new needs and requirements are appropriate.


_Murthlyn Aldridge_

Murthlyn Aldridge, Executive Business Advisor/Contracting Officer
Federal Student Aid
Acquisitions

**AR 28**

CERTIFICATION OF CONTRACTING OFFICE ADMINISTRATIVE RECORD
For Cancellation of Solicitation No. ED-FSA-16-R-0009 and
Contract Nos. 910031-18-D-0001; 910031-18-D-0002

I, Murthlyn Aldridge, Contracting Officer and custodian of the contracting office files for the above referenced procurement in the Department of Education, hereby certify that to the best of my knowledge and belief, and after careful review, that the foregoing documents constitute the record of administrative actions performed in the cancellation of the above-referenced Solicitation and Contracts and relevant to the issues raised in the plaintiffs' complaints. The documents contained in the administrative record are the documents required to be maintained in accordance with this agency's procurement regulations FAR § 4.803, as well as documents identified in Appendix C to the Rules of the United States Court of Federal Claims.

Executed, June 29, 2018