# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
# BID PROTEST

| | |
|---|---|
| **FMS INVESTMENT CORP.**, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 18-862C (consolidated) |
| ) | |
| **UNITED STATES OF AMERICA,** ) | Judge Wheeler |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| **ALLTRAN EDUCATION, INC.,** ) | |
| ) | |
| Defendant-Intervenors ) | |
| ) | |
| _____) | |

## PLAINTIFFS' BRIEF IN SUPPORT OF
## JOINT EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to the Court's Order of July 13, 2018, Plaintiffs FMS Investment Corp. ("FMS"), GC Services Limited Partnership ("GC Services"), Windham Professionals, Inc. ("Windham"), Continental Service Group, Inc. ("ConServe"), and Account Control Technology, Inc. ("ACT") respectfully submit this brief in support of Plaintiffs' Joint Emergency Motion for Temporary Restraining Order ("TRO") (Dkt. No. 60). Recent legislative developments reinforce that Plaintiffs are likely to succeed on the merits of their protests of the Department of Education's ("Agency" or "ED") improper cancellation of Request for Proposals ED-FSA-16-R-0009 (the "Solicitation") and further support the remaining TRO/preliminary injunction factors such that this Court should enjoin the Agency from recalling accounts currently being serviced under Plaintiffs' active ATE contracts.

This Court enjoined ED from recalling Plaintiffs' accounts in February 2018, finding the balance of the TRO/preliminary injunction factors favored Plaintiffs. *FMS Inv. Corp. v. United States*, 136 Fed. Cl. 439 (2018).  Following cancellation of the Solicitation, the Court ruled from the bench on June 26, 2018 against imposing preliminary injunctive relief pursuant to Plaintiffs' subsequent Motions to enjoin account recalls. However, on July 3, 2018, ED itself postponed the planned recall following the release of a Senate committee report that explicitly "***direct[ed] the Department not to recall accounts***." S. Rep. No. 115-289, at 199 (2018) (emphasis added). This direction is consistent with the Consolidated Appropriations Act, 2018 ("FY 2018 Appropriations Act") (enacted March 23, 2018), which addressed ED's mismanagement of its student loan programs.  Without explanation, on July 13, 2018, the Agency then abandoned its own postponement, and improperly and unreasonably attempted to initiate an immediate recall of Plaintiffs' accounts, thereby subverting specific legislative direction. ED's recall decision is a blatant attempt to undermine clear legislative intent, including that set forth in statute enacted by Congress earlier this year.

Due to ED's continued struggles to manage its debt collection programs, Congress has taken decisive action mandating that the Agency institute changes to its programs. As set forth in Plaintiffs' July 13 Motion, the most recent articulation by Congress is in the funding bills passed by the Appropriations Committees of both Houses. On June 28, 2018, the Senate Committee on Appropriations approved the Fiscal Year ("FY") 2019 funding bill and related Committee Report for ED, which passed with overwhelming bi-partisan support by a vote of 30 to 1. S. Rep. No. 115-289 (2018).  The Senate admonished ED for its recent mismanagement of the defaulted Federal student loan process and encouraged the Agency to continue contracting with large businesses to serve the best interests of the borrowers.  The Committee Report provided as follows:

STUDENT AID ADMINISTRATION

> Appropriations, 2018 ……………………………. $1,678,943,000
> Budget estimate, 2019 …………………………  1,772,000,000
> Committee recommendation ……………………...  1,678,943,000

* * *

> Defaulted Student Loan Servicing.--*The Committee is concerned with the Department's recent management of the defaulted Federal student loan process and with the capacity of current private collection agencies receiving new accounts to be able to properly serve borrowers who have defaulted on their loans.* Accordingly, the Committee encourages the Department to extend current contracts with private collection agencies whose award term extensions are set to expire in April 2019, and that are affirmatively meeting all contract requirements, serving the fiscal interest of the United States, and complying with applicable consumer protection laws until the Department is able to transition to a new collections process as part of the Department's Next Generation Financial Services Environment. *Furthermore, the Committee directs the Department not to recall accounts that are not in repayment from such private collection agencies and allow them to continue servicing their current portfolio to avoid disruptions for borrowers, and to comply with the performance reporting requirements of the explanatory statement accompanying the Consolidated Appropriations Act, 2018*.

S. Rep. No. 115-289, at 199 (emphasis added).  Soon after issuance of the Senate report, the House of Representatives adopted an amendment to the House Appropriations Committee's FY 2019 funding bill specifically stating that ED should continue to use large business private collection agencies ("PCAs") to achieve collections commensurate with the average in previous years and establish performance targets for its debt collection activities. *See* Amd. No. 38 (Rep. Cole), available at https://appropriations.house.gov/uploadedfiles/all_adopted_amendments_part_two.pdf.

**I.   THE HOUSE AND SENATE DIRECTIONS CONFIRM THE COURT SHOULD ENTER PRELIMINARY INJUNCTIVE RELIEF**

The Senate Committee's directive and House Committee's amendment bear directly on this Court's analysis of the four preliminary injunction factors. Since this Court's prior hearing, during which the Court acknowledged that Plaintiffs had raised persuasive arguments, both houses of Congress have expressly echoed the Plaintiffs' arguments regarding the capacity and capability of utilizing existing small-business PCAs to handle the Agency's entire defaulted student loan program.

Members of Congress are directly accountable to their constituents and to American taxpayers generally, and are responsible for overseeing the operations of executive agencies. Here, in the exercise of its oversight functions of this $1.5 trillion program, Congress made clear that ED should not take any action to recall accounts from Plaintiffs. The Senate committee even issued a Report expressly questioning the Agency's assertion that the current PCAs have the capacity to handle the defaulted loan portfolio and ***directing*** ED not to recall accounts from the ATEs to ensure collections continue and there is no disruption to borrowers while ED continues to develop its strategy. Moving forward with account recalls from the Plaintiffs is not an inconsequential matter as the Government suggests. To the contrary, these recent Congressional actions bear directly on the Court's analysis of the equities of preliminary injunctive relief. In fact, these actions swing all four of the injunction factors completely to the side of Plaintiffs.

**Likelihood of Success on the Merits**

Regarding the first, and most important injunction factor, the legal effect of the recent Congressional action is to further confirm that Plaintiffs are likely to succeed on the merits of their protests that ED's cancellation decision was unreasonable. As Plaintiffs have articulated, both in the prior injunction briefing and in their recently submitted Motions for Judgement on the

Administrative Record ("MJARs"), ED's conclusions—(i) that the shift to a completely new collections regime by loan servicers will purportedly obviate ED's current and ongoing need for large business PCAs and (ii) that the current small business PCA capacity is purportedly sufficient to handle the defaulted account volume through 2024—are irrational and unsupported. Congress clearly agrees on both points.

*First*, regarding the shift to a new collections process, the Senate committee—in its oversight function—plainly does not believe that any shift in collection systems is imminent or that the recently conceived plan immediately obviates the need for large PCAs. To the contrary, the Senate Committee studied ED's management of the defaulted loan portfolio and expressly concluded that the large ATE contractors ***presently are still necessary*** while ED makes the transition to the new system. Because of this conclusion, the Senate committee "encourage[d] the Department to extend current contracts with [PCAs] whose award term extensions are set to expire in April 2019 . . . until the Department is able to transition to a new collections process as part of the Departments [NextGen] Environment." Contrary to the Contracting Officer's sparsely documented "analysis," the Senate Committee plainly agrees with Plaintiffs that, even if the Agency were eventually to shift to a new system for collection of delinquent or defaulted student loan debt, that new system is in no way imminent and that large business PCAs are necessary in the interim. Thus, the first rationale provided in the Contracting Officer's cancellation decision is neither documented nor the product of reasonable analysis, and Plaintiffs should prevail.[1]

---

[1] Plaintiffs would also note that at least one plaintiff, Windham, proposed to assist ED immediately in developing its new "enhanced servicer" approach to student loan collections, and was rebuffed by ED. Instead, ED replied that FSA had not even established "its procurement strategy for implementing the work being identified as 'enhanced servicing'" and instructed Windham to await whatever future competitive procurement ED should propose to select firms for such a role, evincing that, contrary to its suggestions to the Court, ED has nothing currently underway to implement its envisioned "enhanced servicer" role.

*Second*, regarding ED's assertions regarding its current capacity—based on 11 small businesses—being sufficient to meet its current and future needs for collecting on defaulted student loan debt, Congress does not agree.  Both the House and Senate clearly indicated that large business PCAs currently are necessary for effective collection on defaulted accounts.  The House has amended the language of the bill to require "the optimal use of qualified large and small business contractors to help the Office achieve" similar resolution percentages as those established when the large business PCAs were involved with the program.  *See* Amdt. 38 (Rep. Cole), *available at* https://appropriations.house.gov/uploadedfiles/all_adopted_amendments_part_two.pdf.  Thus, based on its own analysis, the House plainly does not believe that the current small businesses alone are sufficient to achieve the desired resolution percentages—*i.e.*, they lack the current capacity to meet the goals Congress expects ED to achieve.

The Senate was even more explicit: "The Committee is concerned with the Departments recent management of the defaulted Federal student loan process ***and with the capacity of current [PCAs] receiving new accounts to be able to properly serve [defaulted] borrowers***." S. Rep. No. 115-289, at 199 (emphasis added).  To this end, the Senate committee expressly "***direct[ed]*** the Department not to recall accounts that are not in repayment from [the ATE plaintiffs] and allow them to continue servicing their current portfolio" in part to "***avoid disruptions for borrowers***." *Id.* (emphasis added).  In other words, looking at the same data that ED should have reviewed, the Senate overseers concluded that the current small business PCAs ***do not*** have the requisite capacity to effectively service the current level of defaulted accounts, let alone the increasing amounts that will become available in the future.  Further, the Senate's solution to this capacity issue is both to encourage ED to extend the ATEs' contracts and to ensure that they retain their accounts.

Thus, the Senate Committee's Report both supports Plaintiffs' contention that the Defendant's capacity arguments are specious, and supports Plaintiffs' requested remedy of a preservation of the status quo. Given Congress' actions, Plaintiffs are likely to succeed on the merits of their protests considering that the representative branch of government with responsibility for oversight of ED's program at issue has weighed and rejected the very rationale proffered by ED, and has further expressly endorsed the need to maintain the *status quo* as Plaintiffs seek. Consequently, as in February in this matter, Plaintiffs have a high likelihood of success on the merits of their protests.[2]

**Irreparable Harm**

The legal effect of ED disregarding these recent Congressional actions also bears on the irreparable harm factor. As the Court found in February, Plaintiffs will suffer irreparable harm in the event the Department begins an account recall to take place over the course of ten weeks. Now, according to the latest recall and postponement notices from ED, ED intends to implement the first large recall the same afternoon on which the upcoming hearing concludes, and to complete it in days, rather than weeks. In other words and for no apparent reason other than to disrupt the PCAs, ED has decided to significantly accelerate its recalls. In the event ED is permitted to proceed with the recalls tomorrow afternoon, the Plaintiffs will not even have the opportunity to communicate to their workforce that many of them will no longer have any work when they arrive the next morning. Thus, as in February, the Plaintiffs face the same threats of irreparable harm while this Court evaluates the merits of their protests—and now on a more accelerated, unreasonable basis.

---

[2] Given that the responsible Congressional committees have intervened to provide their own direction to ED, the Court need not be concerned that issuing injunctive relief requested here would be "micromanagement" of the agency. Rather the Court is merely giving effect to the direction Congress itself has endorsed.

Moreover, if ED implements its rushed recall, that precipitous act will also serve to moot the Senate Appropriations Committee's very direction for ED not to take this action. Thus, the irreparable harm will spread beyond plaintiffs and will impact Congress as well. While Congress could, theoretically, countermand ED's actions retroactively, such a directive cannot undo the damage to Plaintiffs and borrowers that would be inflicted in the interim. Thus, this Court should find that this prong also weighs heavily in Plaintiffs' favor.

**Balance of the Harms and Public Interest**

Perhaps the most significant legal effect of the recent Congressional actions is how definitively they speak to the balancing of the harms and the public's interest in this case. In its February 2018 decision granting Plaintiffs' request for a preliminary injunction, this Court found that a balancing of the harms leaned decisively in Plaintiffs' favor. *FMS Inv. Corp.*, 136 Fed. Cl. at 444. In its June 2018 defense, the Government staked its position on potential harm to borrowers, claiming that the sole reason these recalls were necessary was to give accounts to PCAs with a "longer runway" and avoid possible disruptions to borrowers. Def.'s Opp. To Pls.'s Mot. For a TRO and Prelim. Inj., *FMS Investment Corp., et al. v. United States*, No. 18-862C (Fed. Cl. June 25, 2018) (ECF 19). During the July 13, 2018 argument regarding Plaintiffs' motion for an emergency TRO, counsel for the Government confirmed that this rationale was still the only reason why ED had suddenly moved to recall accounts on a mere seven hours' notice.

But subsequent events have obviated the Government's offered justification. On July 3, 2018, the Government itself voluntarily stayed the account recalls, presumably based on its own assessment that the public interest weighted against the recalls. That delay occurred despite the Government's argument at the June 26, 2018 hearing that the recalls needed to begin by July 3, 2018 to protect borrowers, and thus the delay confirms the Government's prior claim was exaggerated. After a nearly 10-day delay, ED suddenly announced an immediate recall plan

without either an announced justification or the support of Congress. In fact, the announcement defied Congress' wishes. Given the timing of the recalls, the Government's proffered justification no longer holds. Initially, the Government represented to the Court that all recalls needed to be completed prior to July 19 to avoid unnecessary disruption to borrowers in rehabilitation. Dkt. No. 19-1 ("Lavia Decl.") ¶¶ 4-5; 19-20. This justification fails to support the Government's arguments in response to the current motion for at least two reasons.

*First*, even were the Government to have proceeded with recalls beginning July 13, its recently announced plan would still mean that a substantial portion of the recalls would occur after ED's own self-imposed (and arbitrary) deadline. In other words, the parties are now back in the same situation the Court evaluated in February—ED intends to make account recalls that will mortally wound the Plaintiffs, simply because it can. There is absolutely no harm to ED ***whatsoever*** in waiting until this protest is resolved before making any decision on recalling accounts on the Plaintiffs' active contracts.

*Second*, Mr. Lavia's complete reliance on **loan rehabilitation** as the sole mechanism for resolving loan default is misleading. ED's sole proffered justification in arguing the recalls needed to occur immediately—which counsel for the Government affirmed was still the sole reason for ED charging forward with the recalls during the July 13 teleconference—is that borrowers with rehabilitation agreements needed PCAs with at least 10 months remaining on their contracts in order to avoid disruption. *See* Lavia Decl. ¶¶ 19-20. However, rehabilitation is only one of several means by which a PCA can assist a borrower to resolve a default. ED's own data, illustrated below, demonstrates that borrowers currently serviced by the five ATE Plaintiffs rely on a variety of default resolution methods:

**Rehabilitation versus Other Resolution Types by 5 ATE PCAs**

| Resolution Type | Unique Borrowers |
|---|---|
| Borrowers in Wage Garnishment | 301,491 |
| Borrowers in Voluntary Payments[3] | 972,918 |
| Borrowers Completed Rehabilitation | 519,157 |
| Borrowers Completed Consolidation | 74,790 |
| **Total** | **1,868,356** |

Thus, there is no basis for claiming harm to borrowers in the event the relevant accounts are not immediately recalled, as Congress recognized in the Senate Committee report, and ED implicitly recognized in it voluntary postponement of the recalls.

Moreover, ED's claim that its rush to recall accounts from Plaintiffs serves the public interest in promoting effective borrower servicing is no longer tenable, because the borrowers' representatives in Congress have specifically stated that it is ***not*** in the public's interest for ED to suddenly recall millions of accounts from the ATE Plaintiffs.  The elected representatives of both the borrowers and the American taxpayers have conclusively stated that they are concerned with the current PCA's ability "to properly serve borrowers who have defaulted on their loans" and directed that ED should not recall accounts precisely "to avoid disruptions to borrowers." S. Rep. 115-289, at 199.  As Plaintiffs repeatedly have stated, it is ***more harmful*** for the public to have these accounts recalled than to allow the ATE contractors to continue servicing them, and now the public's representatives have expressly agreed.  *See generally* Dkt. No. 73-1("Roskam Decl.") (expressing concerns regarding ED's proposed plans and ED's complete lack of transparency and responsiveness to Congress).  Those members of the legislative branch have evaluated the impact

---

[3] The Voluntary Payments category includes those borrowers currently making voluntary payments pursuant to compromise agreements, consolidations, rehabilitation, or the original loan terms.

to their constituents and the taxpayer, and through their oversight authority, have specifically concluded that it is *not* in the public's interest for ED to proceed with recalling accounts.

Although ED apparently intends to completely disregard this legislative directive, the Court should consider it, and find that, when both Congressional committees with jurisdiction over appropriations for the very program at issue expressly find that the Agency's action sought to be enjoined is not in the public's interest, the public interest factor completely favors injunctive relief if the Agency intends to take that particular action anyway. In sum, with ED having abandoned its own prior public interest argument for the recalls, and the leading Congressional committees with jurisdiction over the relevant area having indicated decisively that the public interest is against such recalls, Defendant has no basis to assert that its proposed action is in the public interest at all. Thus, the legal effect of the recent Congressional action is to decisively indicate that both the balancing of the harms and the public interest favors preliminary injunctive relief while the Court evaluates the merits of this protest.

## II. THE SENATE REPORT REPRESENTS CONTINUED LEGISLATIVE ACTIVITY CONSISTENT WITH THE CONSOLIDATED APPROPRIATIONS ACT, 2018

Congress' recent statements about ED's mismanagement of its student debt collection program and its insistence that large business PCAs are necessary for collection efforts reflect the mandate to FSA in the FY 2018 Appropriations Act enacted March 23, 2018 (PL 115-141 [H.R. 1625], at 746-47), which is explicitly referenced in the sentence included in the Senate Report that directed ED *not* to recall Plaintiffs' accounts. S. Rep. No. 115-289, at 199.

With respect to Student Aid Administration, the 2018 Appropriations Act mandated that ED allocate borrower accounts based on servicer performance "compared to all loan servicers utilizing established common metrics, and on the basis of the capacity of each servicer to process

new and existing accounts…" PL 115-141 [H.R. 1625], at 746 (emphasis added).[4] The Explanatory Statement to the FY 2018 Appropriations Act expresses "concern about specific elements of the Department's proposal to significantly revamp the Federal student loan servicing process" and directs the Agency to provide quarterly reports including "performance metrics, total loan volume, and number of accounts broken out by servicer and for each private collection agency." 164 Cong. Rec. H2697-01 (March 22, 2018).[5] Congress wanted ED to provide information on contractor performance and anticipated that ED would allocate borrower accounts to its contractors based on *performance* measured via *established metrics* common to all contractors.

At the time the Consolidated Appropriations Act, 2018 was enacted, Plaintiffs were performing their ATE contracts, servicing both in-repayment accounts as well as non-paying accounts. Also at this time, Congress understood that ED would award additional large PCA contracts under the Solicitation, which includes a specific formula for account allocation based on performance metrics (borrowers resolved and dollars collected). Solicitation § C.3.37, Contractor Performance Monitoring and Evaluation (Allocation Methodology).

Since this time, ED has failed to use performance metrics to evaluate PCA contractors.[6] ED also irrationally cancelled the Solicitation without conducting a reasonable analysis of the

---

[4] Notably, the funding allocated in both the Senate and House Reports is the *exact* amount allocated pursuant to the 2018 Act. Thus, it is meant to cover the same ED programs. S. Rep. No. 115-289, at 199; H. Rep. No. 115-___, at 141, available at https://appropriations.house.gov/uploadedfiles/labor_report.pdf.

[5] The introduction included in the Explanatory Statement provides, "Each department and agency funded in this Act shall follow the directions set forth in this Act and the accompanying statement, and shall not reallocate resources or reorganize activities except as provided herein." 164 Cong. Rec. H2697-01 (March 22, 2018).

[6] ED previously used performance metrics to evaluate its contractors relative to one another, but inexplicably stopped using such metrics in FY 2015.

performance and capacity of all PCA contractors to process new and existing accounts. *See, e.g.*, Dkt. No. 68-1 at 23-25; Dkt. No. 70-1 at 20-25.

Having been made aware of ED's actions, the Senate Appropriations Committee unambiguously addressed the issue, specifically citing the 2018 Appropriations Act and expressing concern over (1) ED's mismanagement of the defaulted loan process, (2) ED's attempt to cut off its best source of debt collection – the large PCAs, and (3) the capacity of current contractors to handle the defaulted portfolio. The Senate Committee therefore directed ED not to recall accounts not in repayment from Plaintiffs, which was the state of affairs at the time Congress enacted the 2018 Appropriations Act.[7] Accordingly, the Agency's directive in the FY 2019 Appropriations Committee Report prohibiting ED from recalling accounts from the Plaintiffs informs the application of the 2018 Appropriations Act and seeks to ensure ED is complying with the 2018 Act as understood by Congress.[8]

Further, it is evident that ED's planned recall of accounts at this stage is an improper attempt to subvert the legislative process before the FY 2019 Appropriations Bill can be enacted. It is abundantly clear that Congress expects ED to execute its programs using appropriated funds. The Committee Report is a direct communication from Congress to the Agency – based on Congressional hearings and input from constituents and outside groups – that provides details on

---

[7] The Committee Report should be afforded significant weight as it represents the intent of the *same* Congress that enacted the Act (the 115th Congress) with respect to the same appropriation. *See Grapevine Imports, Ltd., v. United States*, 71 Fed. Cl. 324, 334 (2006) (finding congressional reports that post-dated the relevant act "must be accorded significant weight" because they were made by "the same Congress that enacted intertwining amendments to the very provision being applied here"); *see also United States v. Waste Industries, Inc.*, 734 F.2d 159 (4th Cir. 1984) (giving weight to Congressional Reports published after enactment of act but prior to enactment of amendments).

[8] The language from the Amendment to the House of Representatives Appropriations Committee Bill similarly informs Congress' understanding of the FY 2018 Appropriations Act.

how to spend taxpayer funds contained in the bill and interpreting a prior appropriations law. Here, in issuing the Committee Report, the Committee made a distinction between *recommendations* and *directives*.[9] For example, the Committee "encourages" the Agency "to make publicly available on its website a detailed list of all individual requests made to the Department under the 'Enforcement Disclosure' provision." *Id.* By contrast, the Committee "*directs*" the Agency not to recall Plaintiffs' accounts. *Id.* There can be no clearer form of Congressional intent cautioning and directing a mismanaged Agency to comply with the mandatory requirements of an Appropriations Bill. *See* Jessica Tollestrup, *Appropriations Report Language: Overview of Development, Components, and Issues for Congress*, Congressional Research Service (July 28, 2015) at 1 ("'[T]he criticisms and suggestions carried in the reports accompanying each bill are expected to influence the subsequent behavior of the agency.'"). Thus, ED's recall of accounts before the 2019 Appropriations Act is passed represents an illegitimate attempt to subvert clear legislative intent, and should be enjoined.

### III. CONCLUSION

For the foregoing reasons, the legal import of the recent Congressional action is that this Court should revisit its earlier decision to withhold preliminary injunctive relief. Given these developments, and the significant legal effect of the equities at issue, this Court should conclude that the situation merits preliminary injunctive relief to preserve the status quo while the Court evaluates the merits of the protests. For whatever reason, ED has decided to act rashly without regard to the consequences of its actions and the obvious disruption they will cause to the status quo. Plaintiffs have argued that ED's actions should be enjoined during the pendency of this

---

[9] Notably, the Report "directs" agency action on a particular topic less frequently than it "encourages" or "requests" action.

protest, and Congress separately has agreed with Plaintiffs that the equities of the situation merit preserving the status quo as this procurement and ED's collection strategy develop.  With such a powerful impact on the Court's preliminary injunctive analysis, the legal effect of the recent Congressional action is that the Court should enjoin ED from disrupting the status quo while Plaintiffs' protests are pending before the Court.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: July 18, 2018 | SHEPPARD  MULLIN  RICHTER  &  HAMPTON LLP |
|  | /s/ Jonathan S. Aronie<br>Jonathan S. Aronie<br>2099 Pennsylvania Avenue NW, Suite 100<br>Washington, DC 20006-6801<br>Telephone (202) 747-1902<br>Direct Facsimile (202) 747-3802<br>Email: jaronie@sheppardmullin.com |
|  | *Counsel for Plaintiff Account Control Technology, Inc.* |

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served on all parties electronically via the CM/ECF system on this 18th day of July 2018.

/s/ Jonathan S. Aronie
Jonathan S. Aronie