## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### (BID PROTEST)

|  |  |  |
|---|---|---|
| FMS INVESTMENT CORP., ET AL., | ) ) ) ) | **REDACTED VERSION** |
| *Plaintiffs,* | ) ) ) | **No. 18-862** |
| v. | ) ) | **Judge Wheeler** |
| UNITED STATES, | ) ) ) | ███████████ |
| *Defendant.* | ) ) ) |  |

## AUTOMATED COLLECTION SERVICES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

John R. Prairie
WILEY REIN LLP
1776 K Street NW
Washington, DC 20006
jprairie@wileyrein.com
Phone: (202) 719-7167
Facsimile: (202) 719-7049
*Counsel of Record for Automated Collection Services, Inc.*

*Of Counsel:*
Brian G. Walsh
Cara L. Lasley
WILEY REIN LLP

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................................... 1

II.     QUESTIONS PRESENTED.............................................................................................. 2

III.    STATEMENT OF FACTS .................................................................................................. 2

IV.     STANDARD OF REVIEW ................................................................................................ 4

V.      ARGUMENT ...................................................................................................................... 5

      A.    ED's decision to cancel the Solicitation was irrational because ED's new vision for an enhanced servicer program is just that—an unrealized vision of its future needs. ........................................................................................................................... 6

      B.    Because ED has no definitive plan for how it will significantly decrease default debt in the next five years, it still has a need for default debt collection today.............................................................................................................................. 9

      C.    Enjoining the cancellation of the Solicitation is not micromanaging how ED achieves its goals; it is a necessary step to ensure fairness to offerors. ................ 11

      D.    ACSI is entitled to injunctive relief. ................................................................... 12

VI.     CONCLUSION.................................................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

## Cases

*DGR Associates, Inc. v. United States,*
94 Fed. Cl. 189 (2010) .................................................................................................12

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009).......................................................................................................11

*MORI Associates, Inc. v. United States,*
102 Fed. Cl. 503 (2011) .............................................................................................5, 11

*Motor VehicleManufacturers Ass'n v. State Farm Mutual Autombile Insurance Co.,*
463 U.S. 29 (1983).........................................................................................................5

*Parcel49C Ltd. Partnership v. United States,*
31 F.3d 1147 (Fed. Cir. 1994)....................................................................................4, 11

*PGBA, LLC v. United States,*
389 F.3d 1219 (Fed. Cir. 2004).....................................................................................12

*RLB Contracting, Inc. v. United States,*
118 Fed. Cl. 750 (2014), *aff'd mem.*, 621 F. App'x 1026 (Fed. Cir. 2015) (per curiam) ...........................................................................................................................11

*Savantage Financial Servs., Inc. v. United States,*
81 Fed. Cl. 300 (2008) ..................................................................................................12

*Sierra Club v. Salazar,*
177 F. Supp. 3d 512 (D.D.C. 2016) ................................................................................7

*Starry Associates, Inc. v. United States,*
127 Fed. Cl. 539 (2016) ..................................................................................................3

## Comptroller General Decisions

*General Revenue Corp.,*
B-414220.2, Mar. 27, 2017, 2017 CPD ¶ 106 .........................................................3

## Regulations

FAR 7.104.............................................................................................................................7

FAR 7.105.................................................................................................................................7

FAR 10.002..............................................................................................................................7

FAR 15.203..............................................................................................................................7

FAR 15.208..............................................................................................................................7

FAR 15.504..............................................................................................................................7

**Other Authorities**

S. Rep. No. 115-289 (2018)......................................................................................................7

Andrew Kreignbaum, *Trump Administration Backs Off Reshuffling of Student
Debt Collection,* Inside Higher Ed (July 9, 2018) ...................................................................7

# I.
## PRELIMINARY STATEMENT

This is a clean case in a messy procurement.  Leaving aside issues of account recalls and ATEs, this protest turns on one question and one document.  The question—whether the Department of Education's ("ED") needs have changed to justify cancellation of this procurement—is easily answered.  The document—a two-page memo memorializing ED's decision to cancel the Solicitation—makes clear what ED's needs are, and what they will be for the foreseeable future.

The memo describes two reasons that ED cancelled the Solicitation.  First, ED has a "new vision" for how it will service and collect student loan debt, which ED maintains will eliminate the need for default debt collection by private collection agencies ("PCAs").  Second, during the period in which ED transitions to and implements its new vision, ED believes all default debt collection can be performed by small business PCAs under existing contracts.  Neither rationale survives scrutiny.

The first justification for cancelling the Solicitation is easily disposed with.  ED's "new vision" is preliminary, amorphous and lacking in any evidence that it will ever actually happen.  Nor is there even a notional timeline on which ED will attempt to execute this wholescale overhaul of the present student loan debt collection system.  All that exists is a three-paragraph thumbnail sketch of what ED hopes will one day become a reality.  ED's wishful thinking of how student loan debt will be serviced and collected sometime in the future does not justify its decision to cancel a Solicitation for default debt collection services today.

ED's second justification fares no better.  ED's conclusion that small business PCAs can satisfy all of ED's current default collection needs is an abrupt and unsupported change from its

position just six months ago.  Then, ED believed that it needed both the small business and large business PCAs to meet its needs.  Even though nothing has changed in that time, ED now claims that it only needs the small businesses.  With no explanation for its shifted position, ED's new-found stance cannot support the cancellation.

Because there is no rational basis for the decision to cancel the Solicitation, the Court should enjoin the cancellation.  Offerors like ACSI and its partners have invested significant time and resources trying to win this work.  Recognizing that investment, the Federal Acquisition Regulation ("FAR") requires ED to fairly and honestly consider the proposals submitted in response to the Solicitation.  ED failed to meet that responsibility when it irrationally cancelled the Solicitation.  The appropriate remedy under the circumstances is to enjoin the cancellation, return the parties to the *status quo ante* the illegal cancellation, and then allow ED to manage this procurement, its contracts and other efforts as it sees fit so long as it does so in compliance with the law.

## II.
## QUESTIONS PRESENTED

(1)  Was ED's decision to cancel the Solicitation rational when it was founded on ED's "new vision" for a future method of servicing and collecting student loan debt?

(2)  Should the Court enjoin the cancellation?

## III.
## STATEMENT OF FACTS

ED announced its need for default debt collect services in July 2013, when it issued the solicitation that proceeded the Solicitation at issue here.  In response to pre-award protests, in late 2015 ED cancelled the predecessor solicitation to "reassess its requirements for Debt

Collection Services." *See* Modification of ED-FSA-13-R-0010, *available at* https://www.fbo.gov/index.php?id=de41b4503fdc0ce05e2f6fa6a5c63b31. After "reassess[ing] its requirements," ED confirmed its need for this work and issued the revised Solicitation at issue here. *See* Solicitation, ED-FSA-16-R-0009. Following the receipt and evaluation of proposals, ED awarded seven contracts in December 2016. Those awards were protested at the Government Accountability Officer ("GAO"). GAO sustained the protests and recommended, among other things, that ED amend the Solicitation as appropriate "to reasonably reflect the agency's needs." *Gen. Revenue Corp.*, B-414220.2, Mar. 27, 2017, 2017 CPD ¶ 106. ED accepted GAO's invitation. In May 2017, ED issued a revised Solicitation reconfirming that it needed large business PCAs to support default collections. *See* Solicitation Amend. 5. ED accepted and reviewed proposals under the revised Solicitation and, in January 2018, ED awarded two contracts. Disappointed offerors protested the awards in February 2018. While those protest were pending, ED announced that it no longer needed the services for which it had just made two new contract awards, and was cancelling the Solicitation.

In the memo documenting the decision to cancel the Solicitation, ED states that because "FSA's needs and requirements for servicing student loans in delinquency and default will change significantly in the near future. . . the contracts awarded [] will not satisfy FSA's new requirements and therefore are no longer needed." AR Tab 4 at AR 27. The rest of the memo elaborates on this purported change in ED's needs.

ED first discusses its "new vision" for the servicing and collection of student loan. Currently, student loan accounts that are delinquent less than 360 days are serviced by "non-defaulted servicers." AR Tab 3a at AR 14. If the account is greater than 360 days delinquent,

the loan is transferred into the defaulted portfolio and serviced by defaulted service-providers. *Id.* Most of the accounts in the defaulted portfolio are assigned to a PCA for servicing and collection. *Id.* at AR 14 – AR 15. Under ED's new vision, there would be an "enhanced servic[er]" program, where account servicers would contact borrowers if the account becomes 90 days delinquent. *Id.* at AR 15. The account would then stay with that account servicer, even if the borrower ultimately defaults. *Id.* ED identifies no timeline for making this new vision a reality. AR Tab 4 at AR 28. ED does, however, outline several significant steps that will need to take place before it can actualize its new vision. It will "propose[] changes to current collection practices," which will then be "reviewed to ensure legal compliance." *Id.* After the new approach is implemented, ED will have to hold a competition to contract with vendors that understand "all programmatic, regulatory, and statutory aspects of servicing loans," as opposed to just default collections. AR Tab 3a at AR 15. Only then would ED begin servicing and collecting loans under the new approach.

ED's memo next acknowledges that it will still need debt collection services until its new vision comes to fruition. AR Tab 4 at AR 27. But ED believes that because the small business PCAs providing these services have "more than sufficient capacity, through at least 2024[,] to perform any Debt Collection Services," there is no longer a need for the debt collection contracts that it awarded six months ago under the Solicitation. *Id.* ED therefore concludes that the Solicitation "no longer accurately reflects FSA's needs and requirements." *Id.* at AR 28.

## IV.
## STANDARD OF REVIEW

ED's decision to cancel the Solicitation is subject to the same standard of review as all agency decisions during a procurement: rationality. *See Parcel49C Ltd. P'ship v. United States,*

31 F.3d 1147, 1153 (Fed. Cir. 1994). This is because FAR 1.602-2(b) requires the government to "fairly and honestly" consider proposals. *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 543 (2011). In this context, fairness requires an agency to have a rational basis for cancelling a solicitation once offerors have submitted proposals. *Id.* In other words, an agency cannot change its mind without a rational reason; "once the rights of offerors are implicated, these decisions must be rational." *Id.*

ED's decision to cancel the Solicitation is reviewed for rationality under the Administrative Procedures Act ("APA"). The Court cannot find that ED's decision was rational if in making the decision, ED (1) "entirely failed to consider an important aspect of the problem"; (2) "offered an explanation for its decision that runs counter to the evidence" before it, or the explanation "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"; (3) failed to base its decision on consideration of the relevant factors; or (4) made a clear error of judgment. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Insurance Co.*, 463 U.S. 29, 42-43 (1983).

## V.
## ARGUMENT

ED's decision to cancel the Solicitation is justified on two grounds: (1) ED has a new vision for the future of student loan servicing and debt collection which ED believes will eliminate the need for PCAs; and (2) until the new vision is realized, ED can meet its needs through existing contracts with small business PCAs. *See* AR Tab 4. These grounds do not support ED's decision to cancel the Solicitation.

A.   **ED's decision to cancel the Solicitation was irrational because ED's new vision for an enhanced servicer program is just that—an unrealized vision of its future needs.**

ED spends the bulk of its cancellation memo explaining that its needs have changed because it has a "new vision" for the future of student loan servicing and debt collection.  It is this altered direction, ED asserts, that radically changes ED's present need for PCAs.  ED's new vision cannot support its cancellation decision for two reasons.

First, as ED recognizes, its vision for the future of student loan debt collection is still in early stages of planning and development.  As of May 2018, ED had only just "started to examine the existing processes, practices, and approaches to determine areas for improvement and new ways of managing student loan servicing."  AR Tab 3a at AR 14.  As part of this examination, ED began the process of developing a "new vision" for an enhanced servicing concept.  AR Tab 4 at AR 27.  ED's memo sketches out only the basic outline for the vision and its "goals," but describes no actual concrete plan or schedule for making its vision reality.  *Id.* at AR 27, AR 28.  Although ED apparently has an internal plan "for discussion," it is few on details.  AR Tab 3a at AR 14.  All ED has is a very high-level overview of its proposal for revamping the student loan servicing and debt collection process.[1]  *Id.* at AR 15 – AR 16.

And ED knows that its vision is far from a concrete plan.  Both its memo and its plan recognize that once it comes up with a detailed approach, it will need to compare the new approach with the current approach to figure out how it is changing current practices.  Then,

---

[1] ED includes a "Report on Initial Observations form the Fiscal-Federal Student Aid Pilot for Servicing Defaulted Student Loan Debt" as part of the administrative record.  ED has not claimed that the report from the pilot program provides a detailed strategy for the enhanced servicing program, nor could it.  The sole goal of the pilot was "to give [the Department of the Treasury] first-hand experience in servicing the defaulted federal student loan debt usually collected by FSA through its contracted PCAs."  AR Tab 1 at AR 1.  Although the experience gave Treasury insights into "variables that impact the collection process," at the most, the pilot offers "incomplete" and "preliminary" suggestions for "potential improvements."  *Id.* at AR 1, AR 5

"proposed changes" must be reviewed for compliance with applicable laws before ED can take steps to put the plan in place. *See id.* at AR 15; AR Tab 4 at AR 28.

Moreover, there is no evidence that ED's vision will ever materialize. In fact, according to reports, the plan is currently on hold after the Senate appropriations committee cautioned against getting rid of PCAs. Ex. 1, Andrew Kreignbaum, *Trump Administration Backs Off Reshuffling of Student Debt Collection*, Inside Higher Ed (July 9, 2018), https://www.insidehighered.com/news/2018/07/09/after-rebuke-congress-education-department-suspends-reshuffling-defaulted-student; *see also* Ex. 2, S. Rep. No. 115-289, at 199 (2018). Obviously, this development upsets ED's new vision for the servicing and collection of student loans; and it highlights just how far ED has to go before it implements its new approach. Although reshaping the debt collection process to provide better support to borrowers is a laudable goal, "wishful or whimsical thinking" alone is not a rational basis for agency action. *See Sierra Club v. Salazar,* 177 F. Supp. 3d 512, 532-33 (D.D.C. 2016).

Second, even if ED had a detailed plan to achieve its new vision, any plan would still take a significant amount of time to implement—a major factor ED fails to consider throughout its memo justifying the Solicitation's cancellation. ED's memo provides no definitive or even notional timeline for implementing the enhanced servicer program, let alone the date by which it expects to transition to the new program. *See generally* AR Tab 4. Instead, the memo speaks only in generalities, claiming without support that because of the new program, ED's needs "will change significantly in the near future." *Id.* at AR 27. ED also speculates that, because of the changes to how debt is collected, the work performed by PCAs "will diminish rapidly in the coming months and ultimately become nonexistent," a conclusion for which ED cites no

evidence or data whatsoever. *Id.*. Putting aside that ED's timing estimates are vague and unsupported, there is no plausible path forward that takes mere months. ED has not performed even the most basic preliminary work necessary to put any plan for a new enhanced servicer program into action.

For example, the administrative record contains no evidence of ED having taken any steps toward holding a procurement to select the vendor(s) that will support the new program. Once ED has created a plan to implement the enhanced servicer program, ED will have to: develop an acquisition plan, FAR 7.104, 7.105; conduct market research, FAR 10.002; draft a solicitation, FAR 15.203; receive proposals, FAR 15.208; evaluate proposals to ensure the contractors have "a full and complete understanding" of all aspects of servicing loans, AR Tab 3a at AR 15; award new contracts, FAR 15.504; put a plan in place to "transfer the existing volume of default portfolios," AR Tab 3a at AR 17; and successfully execute that plan. Only once all those steps are completed will ED no longer need the PCAs. But until then, ED's need for PCAs to perform default collection services still exists. And if the current Solicitation is any indication, even going from a fully-drafted solicitation to award could take years. *See supra* § III.

On top of that, ED will need to structure the new enhanced servicer program around other new FSA initiatives, such as the Next Generation Financial Services Environment. ED is currently holding a procurement to "moderniz[e] its technical and operational architecture." Ex. 3, NextGen Financial Services Environment Solicitation – Phase I at 1. The NextGen environment aims to provide "a more flexible, efficient, and effective [loan servicing] environment." *Id.* at 6. The current plan contemplates PCAs interacting with a common

integrated data management platform, *id.*, but if ED revamps the debt collection process, ED will need to evaluate how the activities of new vendors will be integrated with this new platform. These types of considerations, "important aspects" that ED must consider, simply are not addressed in ED's memo justifying the cancellation. Presumably, ED will work through these issues and it continues to develop and refine its plan to implement the new vision. But, as of today, it has not.

In short, ED is a long way from implementing an enhanced servicing program. Because there is no current plan to actualize ED's vision, or even a notional schedule on which ED believes it may be accomplished, it is irrational to conclude that ED no longer needs the default collection services sought in the Solicitation. That is not to say that ED's new debt collection approach will never justify cancelling either a pending solicitation or PCA contracts. But at this time, when the new program is just an idea for a future state, it cannot support cancelling this Solicitation. That would be like, after having offerors spend millions on proposal preparation the Department of Defense could cancel a solicitation for fighter jets because it envisions a future with no war. This would not be rational but is exactly what ED seeks to do here. But the FAR requires agencies to treat offerors fairly and honestly; cancelling a Solicitation for services the agency currently needs without a rational basis is just not fair. As a result, ED's decision to cancel the Solicitation is irrational.

**B.**   <u>**Because ED has no definitive plan for how it will significantly decrease default debt in the next five years, it still has a need for default debt collection today.**</u>

With no concrete strategy to implement its new vision for debt collection, ED still needs default debt collection services in the meantime. Indeed, even ED admits that it will need PCAs

to perform this work until it can put its new plan in place.  *See* AR Tab 4 at AR 27.  Because ED still needs these services—and will for the foreseeable future—there is no rational reason to cancel the Solicitation.

In the cancellation memo, ED points to its current default debt collection contracts with small business PCAs and concludes it can have the work performed under the small businesses' "existing contracts, even if the plan changes or is delayed for a significant period of time."  *Id.* at AR 28.  But just six months ago, ED confirmed that it needed large business PCAs to support its needs by making two new awards under the Solicitation.  ED has provided no credible explanation for its changed conclusion that the existing contracts are sufficient to meet its current needs.

The small business contracts were awarded in 2014.  So when ED issued this Solicitation (and when it accepted proposals, awarded contracts, revised the Solicitation, accepted revised proposals, and awarded new contracts), the small business contracts were in place.  From 2015 to May 2018, ED consistently planned to use both the small business contracts and the contracts awarded under this Solicitation to meet its debt collection needs.  Only now does ED reverse course, concluding that the small businesses alone can meet its needs.  And it does so with no justification, let alone a rational one.

ED's only explanation for its new-found conclusion is a comparison of how many accounts the small businesses are currently handling and a projection of how many accounts it expects will default.  AR Tab 4 at AR 28.  But there has been no change to the capacity of the small businesses or to the amount of student loans that default throughout this procurement.  And nothing's changed today.  Until ED can solidify and achieve its "new vision," ED still needs

default debt collection support.  The only thing changed is ED's conclusion about how it will meet its needs.

But ED cannot simply change its mind, having solicited and received proposals from offerors.  "[A] reasoned explanation is needed for disregarding facts and circumstances" that led to ED's initial decision to issue the Solicitation.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  Having no explanation for its recently-developed conclusion that all defaulted debt should be collected under the small business contracts, the decision to cancel the Solicitation is pinned solely on a hope for the future of debt collection; it is, in short, irrational.

**C.    Enjoining the cancellation of the Solicitation is not micromanaging how ED achieves its goals; it is a necessary step to ensure fairness to offerors.**

Because ED's decision to cancel the Solicitation was irrational, the Court should enjoin the cancellation.  If the Court enjoins the cancellation, it would not be ED what its goals should or should not be, or dictating how ED should achieve those goals.  The Court would simply be preventing ED from taking irrational, illegal action.  In this context, an injunction would stop only the irrational action—the cancellation of the Solicitation under these circumstances.  ED would remain free to manage the contracts awarded under the reinstated Solicitation how it sees fit.  If ED's hopes for its new vision come true and the revised debt collection program eliminates or drastically reduces the need for PCAs, ED would be free to terminate the contracts for convenience.  It could even cancel the Solicitation later if something occurs that legitimately changes its needs.  *See Parcel 49C Ltd. P'ship v. United States*, 31 F.3d at 1154.

An injunction is not micromanaging how ED conducts its procurement.  It simply halts ED from acting in a manner that skirts the law, as this Courts routinely does.  *See, e.g., RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 762 (2014) (ordering agency to reconsider

size standard used for small business set-aside and cancel procurement and resolicit if wrong size standard used in initial solicitation), *aff'd mem.,* 621 F. App'x 1026 (Fed. Cir. 2015) (per curiam); *DGR Assocs., Inc. v. United States*, 94 Fed. Cl. 189, 211 (2010) (requiring Air Force to determine whether procurement could be set-aside for a HUBZone small business concern before issuing procurement as a an 8(a) set-aside); *Savantage Fin. Servs., Inc. v. United States*, 81 Fed. Cl. 300, 311 (2008) (finding agency had engaged in an improper sole source procurement and enjoining DHS "from proceeding with Solicitation No. HSHQDC–08–Q–00018, or any related solicitation until DHS conducts a competitive procurement in accordance with the law to select financial management systems application software").

ED is free to conduct its procurements (and even cancel them) in whatever manner it pleases, but it must act rationally and in compliance with the law. In this case, and at this time, ED simply does not have a rational basis for cancelling the Solicitation, and should thus be enjoined from doing so. *See MORI Assocs.*, 102 Fed. Cl. at 543.

**D.    ACSI is entitled to injunctive relief.**

The injunctive relief factors weigh in ACSI's favor: (1) it has shown success on the merits; (2) it will suffer irreparable harm without an injunction; (3) the balance of harms weighs in favor of an injunction; and (4) an injunction is in the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). An injunction prohibiting ED from cancelling the Solicitation is thus necessary.

If the Court does not enjoin ED's cancellation, ACSI will have lost a meaningful opportunity to compete for a contract for debt collection services and correspondingly, will have lost revenue it would have earned had ED had rightfully awarded it a contract. ACSI and its

partners have invested substantial time and expense into submitting competitive proposals and pursuing protests when ED unreasonably failed to award it a contract.  Had ED properly evaluated ACSI, it would have been awarded a contract.  But because of the cancellation, ACSI never had the opportunity to be fairly considered for award.  This is enough to establish irreparable harm.  *See Starry Assocs., Inc. v. United States*, 127 Fed. Cl. 539, 550 (2016).

For the same reason, the balance of harms weighs in favor of an injunction.  ACSI will be irreparably harmed without an injunction, and any harm to ED is *de minimis*, at best.  ED will still get the services it needs.  *See id.*  The only possible harm would be from having contracts that it does not need.  But with a minimum guarantee of $1,000, if ED ends up without a need for the contracts, it can cancel them for convenience with little effect on ED.

Finally, the public interest is in a fair procurement, one where the government cannot irrationally cancel solicitations once offerors submit proposals.  *See id.*  An injunction only requires ED to go through with this procurement at this time; ED is free to continue developing its requirements for the enhanced servicer program, and if a rational basis presents itself in the future, ED is free to cancel the Solicitation or terminate contracts awarded under the Solicitation at that time.  But there is no public interest in ED jumping the gun at the expense of offerors.

## VI.
## CONCLUSION

For these reasons, ACSI respectfully requests that the Court grant its Motion for Judgment on the Administrative Record.

Respectfully submitted,

s/ John R. Prairie
John R. Prairie
WILEY REIN LLP

-13-

*Of counsel:*
Brian G. Walsh
Cara L. Lasley
WILEY REIN LLP

1776 K Street NW
Washington, DC 20006
jprairie@wileyrein.com
Phone: (202) 719-7167
Facsimile: (202) 719-7049
*Counsel of Record for Automated Collection Services, Inc.*

Dated: July 13, 2018